IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLYING J, INC., | No. CV-F-03-6706 OWW/GSA |
|         Plaintiff, | MEMORANDUM DECISION GRANTING DEFENDANTS' MOTIONS TO DISMISS AND STRIKE SAC AS MOOT AND AS BARRED BY COLLATERAL ESTOPPEL (Docs. 78 & 83) AND DENYING AS MOOT DEFENDANTS' MOTIONS TO STRIKE AND TO DISMISS (Docs. 72, 84 & 85) |
|        vs. | |
| THOMAS PISTACCHIO, et al., | |
|         Defendant. | |

On December 1, 2006, Plaintiff Flying J, Inc. ("Flying J") filed a Second Amended Complaint for Damages ("SAC"). Defendants are Thomas and Delores Pistacchio, Central California Kenworth ("CCK"), John R. Lawson, and Lawson Rock & Oil, Inc. ("Lawson Rock & Oil").

Defendants respectively filed (1) motions to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), Federal Rules of Civil Procedure; and (3) motions to strike pursuant to California Code

1

1   of Civil Procedure § 425.16 (Anti-SLAPP motions).[1]

2       Because of the Court's schedule and the sheer length and

3   complexity of these motions, the Court heard oral argument on

4   November 5, 2007 solely on the issues of mootness and collateral

5   estoppel.

6       At the November 5, 2007 hearing, Flying J requested and

7   obtained leave to file a supplemental brief; Defendants were

8   given leave to reply.  All supplemental briefing is now complete.

9       A.   LIMITATION OF ISSUES IN FLYING J'S SUPPLEMENTAL BRIEF.

10      At the November 5, 2007 hearing, the following statements

11  were made:

12              MR. KATZ:  It was our strongly held position
                that they had to have vacated what happened
13              in 2003.  That was ... the issue.  They had
                to have vacated before they could have a
14              clean hearing in 2004.  We lost on that.  But
                that was the only way the 2003 was involved.
15              The Court did not have jurisdiction to
                consider the 2003.  The statute of
16              limitations had past, and all we could ask
                for, and all we did ask for was with respect
17              to the 2004, and all that the Appellate Court
                decided was with respect to the 2004.
18              There's nothing else.

19              ...

20              MR. KATZ:  We would like permission of the
                Court to brief the statute of limitations on
21              the mandamus proceedings.  Because the '03
                was - we hadn't looked at that, ironically,
22              and the '03 was something by the time we got
                into the case where the statute of
23              limitations had passed.  There's simply -

24  _____

25      [1]Defendants also filed motions to dismiss or stay/abstain
    pursuant to *Colorado River Conservation Dist. v. United States*, 424
    U.S. 800 (1976) and the Court's inherent power.  These motions have
26  been withdrawn.

2

1          there was only one thing at issue in the
           mandamus - there's only one thing that could
2          have been at issue.  There was only one thing
           that the court had the power, the
3          jurisdiction to decide, and so we would ask
           for permission of the Court to brief the
4          Court on the statute of limitations for
           mandamus proceeding.
5
           ...
6
           MR. KATZ:  Well, the request is simply
7          whether we can brief two questions that I had
           mentioned to Your Honor.
8
           ...
9
           MR. HAHESY:  Well, I want to make sure what
10         we're briefing on so that -

11         THE COURT:   Well, we're -

12         MR. HAHESY:  I know one issue's about the
           statute of limitations -
13
           THE COURT:  Here's what I understand.  We're
14         briefing the legal ability of the superior
           court to hear the '03 conflict claims and
15         whether or not it was in excess of its
           jurisdiction if it did consider them as well
16         as the court of appeal then affirming and
           discussing the '03 claims.  If there's law
17         out there, I would like to see it because I'm
           not familiar with it.
18
           MR. KATZ:  And there's a second issue, Your
19         Honor, too, that I mentioned.  And that is
           whether the CTC in '03 could even go forward
20         -

21         THE COURT:  Yes.

22         MR. KATZ: - in '03 -

23         THE COURT:  Yes.

24         MR. KATZ: - based on the conflict -

25         THE COURT:  All right.

26         MR. KATZ:  - of interest.

                          3

1   MR. HAHESY:  I'm not sure I understand the
    second issue, Your Honor -

2

3   THE COURT:  Well, he's saying there's a
    jurisdictional bar once a conflict exists,
    and I don't know whether anybody brought it

4   up that Lawson had a conflict, that in effect
    the Commission is disabled, it's got to stop

5   and determine the conflict, and see if the
    hearing can go forward.  Now, I don't know

6   that to be the law, but it's the law, then we
    need to know it.

7

8   ...

9   MR. HAHESY:  We have briefed, Your Honor, ad
    nauseam in this case the conflict of interest
    issues under the Political Reform Act,

10  Government Code Section 1090, the common law
    conflict of interest.  You know, this

11  motion's been pending for a year.  I'm not
    sure why this issue is now being presented -

12

13  ...

14  MR. HAHESY:  No, but this issue about the
    conflict of interest ... this was front and
    center in their case and they -

15

16  THE COURT:  Well -

17  MR. HAHESY:  - we've been briefing it -

    THE COURT:  - here's the thing.  Discretely,
18  if we can do it in -

19  You can do it in five pages?

20  ...

21  MR. KATZ:  And I think we're pinpointing two
    important issues that came after a lengthy

22  hearing -

23  THE COURT: All right.

24  MR. KATZ: - and I don't think 15 pages is too
    much, Your Honor.

25

26  THE COURT:  We're overwhelmed.  I'm going to
    say that it is.  Do it in 10 pages.  That's

                        4

1    my final word.

2       Flying's J's supplemental brief (Doc. 166) exceeds the scope

3 of the leave granted by the Court.  On pages 2:11-4:3 of Flying

4 J's supplemental brief, Flying J presents legal arguments

5 concerning the effect of the Court of Appeal's "express refusal

6 to consider conflict of interest issues affecting the CTC's 2002

7 and/or 2003 decisions."  On pages 4:4-7:22, Flying J presents

8 arguments concerning the inapplicability of collateral estoppel

9 to the Court of Appeal's decision.  On pages 7:24-10:20, Flying J

10 presents arguments that Defendant Lawson's participation in the

11 2002 and 2003 CTC proceedings should have barred the CTC's

12 decisions even if Defendant Lawson was not the deciding vote,

13 thereby making the 2004 CTC hearing unnecessary.

14       Defendants correctly object to those portions of Flying J's

15 supplemental brief that address issues which Flying J was not

16 given leave to raise.  Defendants request that these portions of

17 the supplemental brief be stricken or that Defendants be given

18 the opportunity to respond.  Because resolution of Defendants'

19 motions has been delayed by repeated stipulations of the parties

20 and, on one occasion, the press of court business, the

21 unauthorized portions of Flying J's supplemental brief are

22 STRICKEN and will not be considered.

23    B.   BACKGROUND.

24       1.   PRIOR PROCEEDINGS BEFORE JUDGE COYLE.

25       This action commenced on November 26, 2003.  By Order filed

26 on May 24, 2004, Judge Coyle dismissed Flying J's First Amended

Complaint against Defendants Thomas and Delores Pistacchio and Central California Kenworth (Pistacchio Defendants) for lack of subject matter jurisdiction.   (Doc. 32).   Judge Coyle ruled that Flying J's claims against the Pistacchio Defendants were moot because the California Transportation Commission (CTC) subsequently independently rejected the real property conveyance:

> Plaintiff can no longer argue that its injury was caused by Defendants' alleged interference because the CTC independently rejected the proposed conveyance.   Plaintiff can no longer prove that Defendants' actions led the CTC to reject the proposed conveyance.   Plaintiff no longer satisfies the causation element.
>
> ...
>
> Plaintiff complains that the CTC's reconsideration of the proposal was flawed and that Plaintiff remains injured to the extent that it has not obtained possession of the property.   Plaintiff's allegations of CTC error do not persuade the court that it has jurisdiction.   Plaintiff does not allege that the flaws in the reconveyance are the result of Defendants' actions.   In order to maintain a suit against the Pistacchios, Plaintiff must allege that the Pistacchios caused its injury.   At the present time, Plaintiff alleges that its current injury was caused by the CTC's mistaken legal analysis of the proposal, not by the Pistacchios.   Plaintiff is rightfully challenging the CTC's reconsideration of its proposal, and thereby seeking redress for its injury, in state court.

Flying J appealed Judge Coyle's ruling.   The Ninth Circuit reversed, limiting its ruling to granting Flying J leave to amend:

> Flying J argues that the February 2004 hearing did not sever the connection between

Pistacchio's conduct and loss of the parcel, and did not remedy the harm it had suffered. Pistacchio contends the opposite, that the February 2004 decision cut off any and all damages.  However, we need not decide whether on the basis of the FAC either side's position, or that of the district court, is correct, for it is clear to us that leave to amend should have been granted ... We express no opinion on how new allegations will play out, or whether it is necessary to reach them in order to decide the underlying case, but we cannot say at this stage of the proceedings that amendment would be futile. Flying J suggested ... that additional facts could be averred which would clearly show that the February 2004 decision was not independent and that it suffered compensable injury on account of Pistacchio's allegedly wrongful conduct.  Therefore, it should have the opportunity to amend.

Thereafter, the SAC was filed adding the Lawson Defendants.

2.  <u>ALLEGATIONS OF SAC</u>.

The "Factual Background" in the SAC alleges in pertinent part as follows:

25.  In or around January 1997, Flying J acquired an 18.8 acre parcel of land, located adjacent to State Route 14 in the Mojave Area of Kern County, California (the 'Flying J Property').

26.  On August 26, 1999, Caltrans filed an action for eminent domain against Flying J (the 'Eminent Domain Action') seeking to condemn 4.43 acres along the southeast border of the Flying J Property (the '4.43-Acre Parcel') for the purposes of a proposed highway expansion.

27.  Throughout 2001, Flying J and Caltrans engaged in negotiations concerning the 4.43-Acre Parcel and the Eminent Domain Action. These negotiations resulted in the creation of a December 13, 2001 Right-of-Way Contract ('Settlement Agreement') between Caltrans and Flying J wherein:

7

a.  Caltrans agreed to dismiss, and Flying J consented to the dismissal of, the Eminent Domain Action which, on information and belief, was worth in excess of $200,000.00 to Caltrans;

b.  Flying J agreed to convey to Caltrans the 4.43-Acre Parcel in exchange for $14,800.00, and;

c.  Caltrans agreed to convey to Flying J, upon the approval of the California Transportation Commission ('CTC'), an approximately 20-acre parcel of State-owned land immediately adjacent to the Flying J Property (the '20-Acre Parcel') in exchange for Flying J's 4.43-Acre Parcel and approximately $87,954.00 in cash.

28.  The 20-Acre Parcel, which was part of a larger tract of land owned by Caltrans, was specifically carved out and made available to Flying J as a result of the Settlement Agreement.

29.  The acquisition of the 20-Acre Parcel was a material inducement for Flying J to enter into the Settlement Agreement.

30.  Flying J has performed all conditions, covenants and promises required on its part to be performed in accordance with the terms and conditions of the Settlement Agreement, except for those terms and conditions that have been excused, prevented, waived and/or released.

31.  Throughout the negotiations leading up to the Settlement Agreement, Caltrans repeatedly stated and gave assurances to Flying J that Caltrans was willing and able to convey the 20-Acre Parcel to Flying J and that CTC approval of the conveyance was a mere formality and would occur without any debate or discussion.

32.  The CTC consists of nine members appointed by the Governor, all appointed to

8

staggered four-year terms, and two non-voting
ex-officio members, one from the State Senate
and one from the State Assembly.

33.  Flying J ... alleges that from November
8, 2000, at least through February 26, 2003,
Lawson was an acting Commissioner of the CTC.

34.  Flying J ... alleges that Pistacchio has
maintained a close personal and business
relationship with Lawson for over twenty-five
years, that they meet socially on a monthly,
if not weekly basis, and that their children
are good friends.

35.  Flying J ... alleges that at all
relevant times, Lawson knew that Pistacchio
had a running feud with Flying J.  Flying J
... alleges that Lawson tried to help
Pistacchio settle a previous lawsuit with
Flying J (a lawsuit that resulted in a $7
million verdict against Pistacchio) by
putting Pistacchio in touch with a mutual
acquaintance who knew a Flying J principal.

36.  Flying J ... alleges that on at least a
dozen occasions prior to the CTC's
consideration of the conveyance of the 20-
Acre Parcel to Flying J, Pistacchio made
slanderous and libelous statements about
Flying J to Commissioner Lawson.  Flying J
... alleges that Lawson is the owner of
Lawson Rock & Oil ... [and] that Lawson,
Lawson Rock & Oil and/or businesses
controlled by Lawson, utilize the types of
trucks, trailers and other heavy equipment
sold by CCK and that Lawson, Lawson Rock &
Oil and/or businesses controlled by Lawson
have an ongoing business relationship with
Pistacchio, CCK and/or businesses controlled
by Pistacchio for the purchasing and leasing
of such trucks, trailers and/or equipment.
Flying J ... alleges that Lawson, Lawson Rock
& Oil and/or businesses controlled by Lawson
have personally negotiated and regularly
purchased from Pistacchio and/or businesses
controlled by Pistacchio approximately 20
large semi-trucks for Lawson's various
trucking businesses for anywhere between
$70,000 and $85,000 - even though the list
price on these trucks is somewhere in the

range of $160,000 and that over the past
approximately five years, Lawson, Lawson Rock
& Oil and/or businesses controlled by Lawson
have been the beneficiary of *retail price
breaks exceeding one million dollars* from
Defendant Thomas Pistacchio's truck
franchise, CCK.

37. Flying J ... alleges that CCK's
Bakersfield, California offices are located
on property owned by Lawson and leased to
CCK.

38. Flying J ... alleges that Pistacchio
learned of the pending conveyance of the 20-
Acre Parcel to Flying J several months prior
to the CTC's consideration of the proposed
conveyance.

39. Flying J ... alleges that ... Pistacchio
expressed to Lawson his desire to obtain the
20-Acre Parcel.

40. Flying J ... alleges that upon learning
of the pending conveyance of the 20-Acre
Parcel to Flying J, Pistacchio, at the
request of Lawson, unlawfully and
fraudulently entered upon the 20-Acre Parcel
to survey and appraise the property.

41. Flying J ... alleges that Pistacchio
used the information obtained during his
unlawful entry upon the 20-Acre Parcel to
prepare a secret bid for the 20-Acre Parcel,
which he gave to Lawson, to induce Caltrans
and the CTC to cause the rejection of the
conveyance of the 20-Acre Parcel to Flying J.

42. Flying J ... alleges that through an
express and/or implied agreement by and among
Defendants, Lawson, Lawson Rock & Oil and/or
businesses controlled by Lawson received
significant financial benefits ('Benefits')
from Pistacchio and/or businesses controlled
by Pistacchio in the form of either political
contributions, surreptitious kick-backs on
goods and services purchased by Lawson,
Lawson Rock & Oil and/or businesses
controlled by Lawson from CCK, or other
financial benefits.  As a *quid pro quo* for
these surreptitious Benefits, Defendants

10

embarked upon a secret conspiracy to deprive Flying J of the 20-Acre Parcel in a manner that would inure to the direct and indirect benefit of Defendants.

43.   The conveyance of the 20-Acre Parcel from Caltrans to Flying J was initially placed on the consent agenda for the CTC's October 3, 2002, meeting.  Even though every other consent item on the October 3, 2002, agenda was approved without discussion, then-CTC Commissioner Lawson, in furtherance of his conspiracy with Defendants, unilaterally initiated discussion and criticism over the conveyance of the 20-Acre Parcel to Flying J. This criticism was baseless in that it was based on the allegedly one-sidedness of the transaction favoring Flying J but did not take into account the settlement value of Caltrans' Eminent Domain Action against Flying J.

44.   Although it was clear from the CTC's October 2002 staff report that Caltrans had worked out a settlement of the Eminent Domain Action, and the damages and exposure relating thereto, resulting in the proposed conveyance of the 20-Acre Parcel to Flying J, Lawson misleadingly characterized the settlement arrangement as a transaction requiring the State to sell 20 acres for $55,000.00.  This characterization wholly ignored the substantial severance damages that were a material component of the settlement.  As a direct result of Lawson's illegal actions, the Commission pulled the conveyance from the CTC's consent agenda.

45.   The conveyance of the 20-Acre Parcel to Flying J was not agendized for CTC consideration again until the CTC's February 27, 2003, meeting.  The conveyance was specifically not agendized for the CTC's November 2002 meeting because Commissioner Lawson could not be there.  Flying J ... alleges Defendants orchestrated a push to strong-arm the staff at Caltrans and undermine their support for the conveyance, making it painfully clear that he would not allow the conveyance of the 20-Acre Parcel pursuant to the terms of the Settlement

11

Agreement under any circumstances.  This strong-arm campaign worked in that Caltrans ultimately agreed to pretend to support the conveyance while actively working against it.

46.  Flying J ... alleges that at a February 26, 2003, dinner meeting of CTC Commissioners (the evening before the publicly noticed February 27, 2003, meeting), Commissioner Lawson circulated a written document, prepared by Pistacchio, among the other Commissioners that purported to be a bid, proposal or offer to purchase the 20-Acre Parcel for $250,000.00.

47.  The next morning, at the February 27, 2003, CTC meeting, Commissioner Lawson made no mention publicly of the fact that he had a written proposal from Pistacchio to purchase the 20-Acre Parcel for $250,000.00 or that he had shared such a written proposal with other CTC Commissioners the evening before, thus enabling him to ensure that the outcome of the hearing would be predetermined.  Further, during the February 27, 2003, CTC meeting Lawson did not publicly reveal that he had informed Pistacchio of the pending sale of the 20-Acre Parcel to Flying J months before; that Pistacchio was and is a close friend; that he asked Pistacchio to provide him with an estimate on the value of the 20-Acre Parcel; that Pistacchio had visited the 20-Acre Parcel in January 2003; that Pistacchio gained access to the site in January 2003, by informing a foreman that he was there at the request of CTC Commissioner Lawson; that Lawson, Lawson Rock & Oil and/or businesses controlled by Lawson purchase and lease trucks and equipment from Pistacchio, CCK and/or businesses controlled by Pistacchio at a significant discount; that Lawson has been the beneficiary of retail price breaks exceeding one million dollars from Defendant Thomas Pistacchio's truck franschise, CCK, or; that CCK's Bakersfield offices are located on property owned by Lawson and leased to CCK.

48.  Despite the fact that consent items are routinely approved without inquiry or debate, that no other Caltrans excess land

12

disposition was rejected by the CTC during Lawson's tenure, and despite statements and assurances from Caltrans that CTC approval of the conveyance of the 20-Acre Parcel to Flying J would be a mere formality, on February 27, 2003, the CTC, <u>upon Lawson's motion</u>, ordered the 20-Acre Parcel sold at public auction.

49.   The CTC, however, is authorized only to accept or reject proposed dispositions of Caltrans' excess lands.   The CTC has no authority to order Caltrans to dispose of excess land or to make any orders regarding the method of such disposition – *i.e.*, direct sale, public auction, exchange, etc.   *The CTC has admitted that its February 27, 2003 order to dispose of the 20-Acre Parcel by public auction exceeded the CTC's authority.*

50.   The auction of the 20-Acre Parcel took place on May 20, 2003.   Unsurprisingly, Pistacchio was the successful bidder and obtained an option to purchase the 20-Acre Parcel for a purchase price of $377,000.00. The contract for the option to purchase the 20-Acre Parcel, however, was executed in the name of Pistacchio's wife, Delores Pistacchio.

51.   The CTC's rejection of the conveyance of the 20-Acre Parcel to Flying J and the decision to sell the 20-Acre Parcel by public auction are the direct and proximate result of Defendants' wrongful conduct, as alleged herein.   But for the conspiracy between Defendants, as alleged herein, the CTC would have approved the conveyance of the 20-Acre Parcel to Flying J in February 2003 and the auction of the 20-Acre Parcel would never have occurred.

52.   Defendants' wrongful and improper use and manipulation of their personal and business relationships and their manipulation and influence on the CTC and Caltrans to deprive Flying J of the 20-Acre Parcel, not only constitutes actionable slander and/or libel, bribery and trespass, but also a conspiracy to commit violations of California's Political Reform Act (Government

13

Code sections 81000-91014), California Government Code section 1090 and California's common law doctrine against conflict of interest, as alleged herein.

53.  Upon learning of the existence and scope of the relationship among Defendants, Lawson's resulting conflict of interest and Defendants' conspiracy to sabotage the CTC approval process for the conveyance of the 20-Acre Parcel to Flying J, Flying J requested the CTC to remedy the injustice that had occurred as a result of the conduct described above.

54.  On January 23, 2004, Flying J was advised that the CTC would consider the following two issues at the CTC's February 26, 2004 agenda: (1) Should the Commission reconsider the proposal to convey the 20-Acre Parcel to Flying J?, and (2) Assuming the first question is answered in the affirmative, should the Commission approve or disapprove the proposed conveyance to Flying J?

55.  On February 17, 2004, Flying J submitted a letter to the CTC providing a detailed explanation of the relevant facts and law necessitating that the CTC reconsider and invalidate its decision of February 2003, based on Lawson's blatant conflict of interest and other wrongful conduct of Lawson and Defendants which rendered the CTC's February 2003, disapproval of the conveyance void from its inception.

56.  At the February 26, 2004, hearing, the CTC refused to consider, address or remedy the conflict of interest and illegal activities described above or make any determination whatsoever regarding the impropriety of any of its previous actions concerning the proposed conveyance to Flying J.  Without invalidating its February 2003, decision, <u>which the CTC has admitted exceeded its authority</u>, or otherwise curing the blatant improprieties surrounding such decision, the CTC again voted to reject the proposed conveyance of the 20-Acre Parcel to Flying J on the alleged grounds that the

14

proposed conveyance is in conflict with the
terms, standards and conditions established
by the Commission in its procedures for sale
of excess property under CTC Resolution G-98-
22 and on the grounds that the terms of the
Settlement Agreement were based on an
allegedly flawed appraisal.

57.  However, CTC Resolution G-98-22 does not
require that the 20-Acre Parcel be disposed
of by public auction.  In fact, Resolution G-
98-22 expressly states that excess property
(such as the 20-Acre Parcel) may be exchanged
for other land required for transportation
purposes (such as the 4.43-Acre Parcel).  The
sole basis for the CTC's purported conclusion
that the conveyance of the 20-Acre Parcel to
Flying J was in conflict with the terms,
standards and conditions established by the
CTC was the personal opinion of a CTC deputy
director who had no prior experience with
Resolution G-98-22 or other Caltrans property
exchanges and not qualified to render a legal
opinion.

58.  Further, there was no documentary or
testimonial evidence presented to the CTC in
support of its conclusion that the appraisal
of the 20-Acre Parcel was flawed.

59.  The CTC's February 2004 alleged
reconsideration of the conveyance of the 20-
Acre Parcel to Flying J was not an
independent review or reconsideration of the
CTC's February 2003 decision.  Rather the
February 2004 'reconsideration' was another
by-product of Lawson's influence and improper
conduct on the CTC approval process, as
alleged herein.

60.  Six of the nine CTC Commissioners who
were exposed to Lawson's improper conduct and
participated in the *ultra vires* order that
the 20-Acre Parcel be sold at public auction
were still sitting Commissioners in February
2004 and were not acting independently when
they voted to re-approve the unauthorized
decision of February 2003.  Lawson's
continuing influence over these commissioners
is reflected by the fact that the CTC
expressly refused to consider whether Lawson

15

had a conflict of interest, or whether the CTC's prior order was improper.

61.  Despite specific questions regarding the value of the 20-Acre Parcel raised in a CTC Staff Report prepared in connection with the CTC February 2004 hearing, not a single Commissioner asked a single substantive question during the 'reconsideration' hearing.

62.  By refusing to invalidate its decision of February 2003, or even consider the improprieties associated with such decision, the CTC's February 26, 2004, decision was nothing more that a meaningless after-the-fact rationalization of its previous flawed decisions and in no way an independent review or reconsideration.  Had the CTC considered and acknowledged the blatant improprieties of its actions of October 2002, and February 2003, it would have had no choice but to invalidate such actions and either order that the property be sold by a new public auction or that the 20-Acre Parcel be conveyed to Flying J, as intended in the Settlement Agreement.

63.  Because the CTC refused to invalidate its ultra-vires decision of February 2003 and failed to conduct an independent review of the February 2003 decision or the alleged improprieties relating thereto, the CTC's February 2004 'reconsideration' is still infected by Defendants' wrongful conduct.  As a result, Defendants' maintain the ill-gotten option to purchase the 20-Acre Parcel and Flying J continues to be damaged by the conduct alleged herein.  Indeed, but for Defendants' wrongful conduct there never would have been a February 2003 order to auction the 20-Acre Property [sic] or a February 2004 reconsideration.  Accordingly, the CTC's actions of February 26, 2004, have had no effect on any of the relief sought herein.

64.  The CTC has never been asked to consider, has never considered, and lacks the authority to render any decision with respect to, Defendants' wrongful and illegal conduct,

as alleged herein, or the damages to Flying J resulting therefrom.  Nor has the CTC ever considered the propriety of Defendants' acquisition and retention of the rights to the 20-Acre Parcel or any legal obligation for Defendants to convey such rights to Flying J.

The SAC alleges the following Claims for Relief:

1.  First Claim for Relief - intentional interference with the Settlement Agreement between Flying J and Caltrans by all Defendants;

2.  Second Claim for Relief - intentional interference with prospective economic advantage - against all Defendants;

3.  Third Claim for Relief - violation of California Business and Professions Code § 17200 - against all Defendants;

4.  Fourth Claim for Relief - imposition of constructive trust on Pistacchio Defendants and CCK;

5.  Fifth Claim for Relief - conspiracy to intentionally interfere with contract - against all Defendants;

6.  Sixth Claim for Relief - conspiracy to intentionally interfere with prospective economic advantage - against all Defendants.

The SAC prays for compensatory and punitive damages, for an order prohibiting Defendants from selling or otherwise disposing of the 20-Acre Parcel, for an order that Defendants hold an interest in the 20-Acre Parcel in trust for Flying J, and for an order requiring Defendants to assign or convey the option to purchase the 20-Acre Parcel and any right, title and interest in the 20-Acre Parcel to Flying J.

3.   <u>PROCEEDINGS IN STATE COURT RE FLYING J'S PETITION</u>

17

**FOR WRIT OF MANDATE**.

On March 24, 2006, Flying J filed a petition for writ of mandamus in the Kern County Superior Court, Case No. S-1500-253208, SPC, against Caltrans and the CTC to in substance set aside the 2003 auction of the real property and the 2004 hearing before the CTC and to require conveyance of the 20 Acre Parcel to Flying J.  Following the submission of evidence and arguments by the parties, Judge Sidney P. Chapin issued a Statement of Decision on October 17, 2005, denying the petition.  Judge Chapin's Statement of Decision ruled in pertinent part:

> The claim made for administrative mandamus (first cause of action) has been previously disposed of and is not part of this ruling. this ruling pertains to the remaining causes of action.
>
> Evidence had been introduced by the parties prior to the hearing.  At the hearing, the cause was argued and submitted for decision. The court, having considered the evidence and heard the arguments of counsel and being fully advised, issued the following statement of decision:
>
> This case focuses on the propriety of actions by the California Transportation Commission ("Commission") and the Department of Transportation ("Caltrans") with regard to 20 acres of state-owned land in Kern County. According to the certified Administrative Record, the state-owned land consists of two adjoining parcels.  (AR Tab Q.)  One of the two state-owned parcels adjoins land owned by Petitioner Flying J, Inc., and according to Flying J is "fully developable."  (AR Tab 1, p. 3, last paragraph.)  The case arises due to the Commission's rejection of a proposal that Caltrans convey the 20-acre property to Flying J.
>
> The legal presumption, pursuant to Evidence

18

Code § 664 that the California Transportation Commission regularly performed its official duties, imposes on the Petitioner the burden to establish the Commission's actions were arbitrary, capricious, unlawful, contrary to public policy or procedurally unfair

Petitioner/Plaintiff fails to carry its burden.

In amending Streets and Highways Code § 118, the Legislature intended that the Commission exercise independent discretionary oversight over conveyances of excess land.

Although this decision discusses whether the Commission properly exercised its discretion in acting on the proposed conveyance, and whether former Commissioner John J. Lawson had a conflict of interest affecting the validity of the Commission's actions, there is a separate, independent basis far denying Flying J's petition.  The proposed conveyance did not comply with Streets and Highways code § 118 or with the guidelines adopted by the Commission pursuant to that section, and as a consequence the Commission did not have the authority to approve it.

This result follows regardless which of two conceptions of the nature of the proposed conveyance are assumed to be correct.  The Commission contends that the conveyance of the 20-acre property was in exchange for $55,000.  Flying J contends that the conveyance of the 20-acre property was part of an exchange of properties, in which Caltrans would be receiving, as part of the consideration for the 20-acre property, 4.5 acres of Flying J-owned property (part of an 18.8-acre parcel adjoining the 20-acre state owned property) needed by Caltrans for highway purposes.

At least one of the two state-owned parcels which make up the 20 acres, and the parcel which was adjacent to the Flying J owned parcel, was described by Flying J's representative as being "fully developable." (Administrative Record Tab J, p. 3, last par.)  If so, and if the proposed conveyance

consisted of a sale of the 20-acres for $55,000 cash, as the Commission contends, then the property should have been sold on a competitive basis as required by Streets and Highways Code § 118 and the guidelines adopted thereto by the Commission.

If, on the other hand, as Flying J has argued, the proposed conveyance consisted of an exchange of the 20-acres of State-owned land for flying J's 4.5-acre parcel (valued according to the contract between Flying J and Caltrans at $14,800) and cash in the amount of $40,200, Streets and Highways Code § 118 and the guidelines adopted pursuant thereto do not allow that type of property exchange. Streets and Highways Code § 118, subdivision (c), allows state-owned excess highway property to be exchanged, "either as whole or part consideration, for any other real property or interest therein needed for state highway purposes." This provision means that Caltrans can dispose of State-owned excess highway property on a non-competitive basis in exchange for consideration the major portion of which is cash. Based on the values set forth in the contract between Flying J and Caltrans, the monetary portion of the consideration for the 20-acre property was 73%, making the acquisition of land by the state a secondary part of the consideration for the sale of two parcels of state-owned land to a private party on a non-competitive basis.

Whether the proposed conveyance of the 20-acres of state-owned land is viewed as part of an exchange of state-owned land for privately owned land and monetary consideration, as described by Flying J, or as simply a sale of the 20-acre property in exchange for cash, as the Commission contends, it was not a conveyance allowable under the applicable statutes and guidelines. The Commission did not have authority to approve such a conveyance, and its disapproval of the proposed conveyance was not an abuse of discretion. However, even if the Commission otherwise had the authority to approve a conveyance of the property, it was within its discretion to disapprove it for

20

1    other reasons.

2        The first Commission meeting at which the
     subject of the proposed conveyance of the 20
3    acres was brought up was the October 2002
     meeting.  Based on the memorandum prepared by
4    the Department of Transportation, the
     proposed transaction appeared to involve an
5    exchange of parcels valued at $55,000.  (AR
     Tab F, p. 2.)  Although it appears the item
6    had been placed on the consent agenda, it was
     brought up for discussion.  Former
7    Commissioner John Lawson, as well as several
     other Commissioners, participated in the
8    discussion which involved questions
     concerning the value of the 20 acres, its
9    location, the nature of the transaction, and
     the nature of any property to be received by
10   Caltrans from Flying J.  Caltrans staff was
     unable to respond to all of the questions but
11   offered to provide more information at a
     later time.  During the discussion,
12   statements were made by a Caltrans'
     representative that suggested that the
13   proposed transaction was something other than
     the exchange of two parcels valued at
14   $55,000.  The Chairperson of the Commission
     then ordered that the matter be withdrawn
15   from the consent calendar.

16       To the extent that Mr. Lawson was involved in
     removing the item from the October 2002
17   consent calendar, he was not precluded from
     doing so by any conflict of interest.  Flying
18   J alleges that Mr. Lawson had a conflict of
     interest that should have prevented him from
19   being so involved based on a financial and
     social relationship he allegedly had with
20   Thomas Pistacchio, the person who later
     submitted the highest bid at the May 2003
21   auction of the property.  However, according
     to Flying J's own allegations, Mr. Pistacchio
22   first learned of the existence of the
     property from Mr. Lawson in December 2002 or
23   January 2003.  (Flying J's Opening Brief on
     the Merits, p. 8.)  Thus, at the October 2002
24   meeting, Mr. Lawson could not possibly have
     been aware of any interest in the property on
25   the part of Mr. Pistacchio.

26       Flying J also alleges that Mr. Pistacchio had

21

often complained to Mr. Lawson about Flying
J's treatment of him in an unrelated legal
dispute between Flying J and Mr. Pistacchio,
and had sought his intercession in an effort
to resolve the dispute, and contends that Mr.
Lawson was thereby prejudiced against Flying
J at the time the proposed conveyance was
brought before the Commission at the October
2002 meeting.  However, there is no evidence
that any such complaints by Mr. Pistacchio
prejudiced Mr. Lawson with regard to Flying
J.  Moreover, members of legislative and
quasi-legislative bodies are not precluded
from acting on matters which may come before
them because they may have heard something
which pertains to the matter.  (See, e.g.,
*City of Fairfield v. Superior Court* (1975) 14
Cal.3d 768.)

Furthermore, the evidence on which Flying J's
allegations of a conflict are based is
inadmissible.  In addition, the Court notes
that removing an item from a consent calendar
subjects it to public discussion and debate.

The proposed conveyance of the 20 acres was
tentatively scheduled for the November 2002
meeting.  However, the item was removed from
the agenda prior to the meeting by the
Executive Director of the Commission based on
her having been informed that Mr. Lawson
would be absent from that meeting due to
medical reasons.  She removed the item from
the November 2002 on her own initiative.  She
was not asked to do so by Caltrans, by Mr.
Lawson, or by anyone acting on Mr. Lawson's
behalf.  The removal of the item was not the
product of any conflict of interest, does not
establish the existence of any conflict of
interest, and did not constitute procedural
abuse by the Commission.

At the February 27, 2003, meeting of the
Commission, The Commission properly rejected
the proposed conveyance.  In determining
whether an agency decision was within its
discretion, the test is whether substantial
information supported the decision.  *Western
States Petroleum Association v. Air Resources
Board* (1995) 9 Cal.4th 559, 565, 574.  There
was substantial information before the

22

1    Commission to support the Commission's
     rejection of the proposed conveyance.
2
     Caltrans submitted a memorandum to the
3    Commission.  (AR, Tab H.)  Among other
     things, the Caltrans memorandum made
4    reference to an appraised value for the 20
     acres of $55,000 (AR Tab H, p. 1), described
5    the payment which the state would receive for
     the 20 acres as consisting of $40,200 cash
6    and land valued at $14,800.  (AR Tab H, p.
     2.)  The memorandum included a map which
7    showed that the 20 acres actually consisted
     of two adjoining parcels.  (AR Tab H, last
8    page.)  The memorandum stated that Flying J's
     property adjoined the 20 acre property, and
9    that the 20 acres were located "adjacent to
     State Route 14, in Kern County near the new
10   alignment of State Route 58 (Mojave
     Bypass)...."  (AR Tab H, p. 2.)
11
     The Caltrans memorandum also stated that the
12   appraised value of the 20 acres "was based on
     existing sales in the vicinity but excluded
13   Flying J's purchase of their property from
     consideration on the basis the sales price
14   was not supported by market data."
     Immediately following this statement, the
15   memorandum contained the following:
16
          "The Department [i.e., Caltrans] is
17        aware of a possible perception of a
          financial windfall to the buyer
18        based on the perceived speculative
          trends after completion of the
19        State's highway project."
20   (AR Tab H, p. 3; emphasis added.)
21   Following this statement the memorandum noted
     that Caltrans had attempted to renegotiate
22   its agreement with Flying J so as to exchange
     equally sized parcels which would have
23   represented like value and which would
     "preserve the before functional utility of
24   their [i.e., Flying J's] parcel," but that
     Flying J had deferred the offer pending the
25   Commission's action.  (AR Tab H, p. 3.)
26   Steve Ikeda, Caltrans spokesman, presented

23

the item to the Commission.  He repeated the statement in the Caltrans memorandum concerning the "possible perception of an immediate windfall to the buyer" and referred to Caltrans' unsuccessful attempt "to renegotiate with Flying J, recognizing the perception."  (AR Tab J, p. 1.)  Flying J's representative addressed the Commission but did not disagree with any of Caltrans' assertions.

In light of the discussions and the information presented to the Commission, including those at the October 2002 meeting, and to the extent that the Commission had the discretion to approve or to disapprove the proposed conveyance, it was not an abuse of the Commission's discretion to disapprove the proposed conveyance.

The Commission's February 27, 2003, rejection of the proposed conveyance took the form of the adoption of a motion to put the property "out to bid."  Streets and Highways Code § 118 gives the Commission the authority to reject a proposed conveyance.  However, the Commission does not have the direct authority to order Caltrans to sell property at auction.  Nonetheless, it is undisputed that the adoption of the motion constituted a rejection of the proposed conveyance to Flying J.  Flying J so alleges in paragraph 29 of its Petition (Pct., 8:26).  Following the Commission's rejection of the proposed conveyance, the Commission's staff advised Caltrans that it could still negotiate an exchange of property with Flying J.  However, Flying J refused to engage in such negotiations.  Upon Flying J's refusal, Caltrans was under a statutory duty to dispose of the excess property, "to the greatest extent possible," through a competitive sale pursuant to Streets and Highways code §§ 118 and 118.6, and the guidelines adopted pursuant to § 118.  Caltrans arranged the auction which occurred in May 2003 and in which several bidders, including Flying J, submitted bids for the 20-acre property in excess of $300,000.

Flying J contends that John Lawson had a

24

conflict of interest at the time of the
February 27, 2003, meeting, predicated on his
relationship with Thomas Pistacchio.  This
contention is based on two things: (1) the
allegation that Pistacchio had complained to
Lawson about how Flying J had treated
Pistacchio in unrelated litigation, and (2)
the alleged financial relationship between
Lawson and Pistacchio.  However, there is no
admissible evidence showing any such conflict
of interest on the part of Lawson.

Putting aside its inadmissibility, the
evidence offered by Flying J still does not
compel the conclusion that Lawson had a
conflict of interest.  First, the fact that
Lawson may have heard complaints by
Pistacchio concerning Flying J and its
treatment of Pistacchio in litigation brought
by Flying J against Pistacchio (unrelated to
the instant litigation) does not establish
that Lawson was precluded from acting as a
member of a quasi-legislative body with
regard to a decision which might affect
Flying J.  Legislators hear many things, some
negative, some positive, concerning persons
and entities who may be affected by decisions
made by the bodies on which those legislators
serve.  It does not follow that they become
prejudiced for or against such persons or
entities.  Moreover, in the instant
proceeding, there has been no evidence
offered to show that Lawson became prejudiced
against Flying J as a result of whatever he
may have heard from Pistacchio.

First, the evidence offered by Flying J does
not show that Mr. Lawson's participation
would have "a reasonably foreseeable material
financial effect" on one or more of Lawson's
economic interests.

Second, the effect of the Commission's
February 2003 decision was to disapprove the
proposed conveyance to Flying J.  However,
Flying J and Caltrans could still have
negotiated a proper exchange.  It was Flying
J's refusal to renegotiate that opened the
way to the auction; the auction was not an
inevitable consequence of the Commission's
February 2003 decision.

25

Third, even if Lawson knew or believed that the February 2003 decision would result in an auction, the evidence does not support the assertion that he knew that Pistacchio would participate in the auction.  The evidence offered by Flying J at most suggests that Pistacchio told Lawson that "he might" bid on the property if it were available.

Fourth, even if Lawson is presumed to have known that Pistacchio would bid on the property if there were an auction, there was no way for Lawson to know that Pistacchio would be the successful bidder at such a public, competitive auction.

Fifth, even if it is presumed that Lawson knew that Pistacchio would be the successful bidder, the evidence offered by Flying J does not establish that there would be a "material" financial affect on any of Lawson's economic interests.  According to Flying J's evidence, Lawson had interests in certain business entities.  However, the evidence does not show with sufficient certainty, clarity, or detail the extent of Pistacchio's ownership in those entities, nor does it show the other information on which an analysis could be made with regard to the materiality standards set forth in applicable law and regulation.

Even if it is assumed that Lawson had a conflict of interest which should have precluded his participation at the February 2003 meeting, the proper remedy would depend on whether the Commission would have reached a different decision in the absence of Lawson's participation or whether Lawson's vote was essential to the adoption of the decision.  See, e.g., *Downey Cares v. Downey Community Dev. Comm.* (1987) 196 Cal.App.3d 983, 989.  The Administrative Record shows that the Commission's decision at the February 2003 meeting was adopted on a vote of seven to one.  Even if Lawson's vote (one of the seven) had been excluded from the total, there would still have been sufficient votes to adopt the decision.  Moreover, there is no evidence of any kind to support a finding that a different decision would have

26

been reached absent Lawson's participation. See Government Code § 91003, subdivision (b).

Even if it were assumed that Lawson's participation somehow affected the essence of the Commission's February 2003 decision, and assuming that the Commission had not on its own initiative, reconsidered the matter, the remedy would have been to require the Commission to reconsider the decision to disapprove the proposed conveyance without the participation of Lawson.  See, e.g., *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152.  The Administrative Record, however, shows that the Commission did decide to reconsider the disapproval of the proposed conveyance, without judicial compulsion, and following a request by Flying J.

Flying J contends that there occurred a violation of the Open Meeting Act in connection with the Commission's February 2003 meeting, or at the dinner which occurred the evening before the meeting.  The Court does not find a violation of the Open Meeting Act at the February 2003 scheduled dinner of the Commission.  There is no competent evidence to support a finding that the members of the Commission discussed the proposed conveyance and reached a decision outside of the context of the public meeting. In any event, any such claim is barred by the applicable Statute of Limitations pursuant to Government Code § 11130.3.

Flying J requested reconsideration of the proposed conveyance.  At the February 2004 meeting, the Commission reconsidered the decision made at the February 2003 meeting. Doing so was within the Commission's discretion.  It was further within its discretion to reject the originally proposed transfer.  There was substantial information before the Commission to support the Commission's rejection of the proposed conveyance.  *Western States Petroleum Association v. Air Resources Board, supra*.

The information presented to the Commission at the February 2004 meeting included the fact that several persons submitted bids at

27

the May 2003 auction in excess of $300,000. In addition, the Commission's staff reported that the appraisal by Flying J's appraiser, who appraised the property for $55,000, contained significant contradictions. Flying J's representatives stated that the consideration for the 20-acre property included not only the $55,000 but also the waiver of severance damages and a compromise value for Flying J's 4.5-acre parcel. However, other information presented to the Commission included the fact that the values asserted by Flying J with regard to potential severance damages and the value of Flying J's 4.5 acre parcel were contradicted by other appraisals and valuations which suggested that the value of the 4.5-acre parcel was less than what Flying J claimed and that the value of severance damages was zero. (AR Tab U, p. 4.)

Based on the information presented to the Commission at the February 2004 meeting, and assuming the Commission had the authority to approve the proposed conveyance, it was not an abuse of discretion for the Commission to disapprove it.

The February 2004 reconsideration cured any defects affecting the earlier decision. There is no evidence of any conflict of interest in connection with the February 2004 meeting. Moreover, the evidence does not support a finding of any violation of the Open Meeting Act in connection with the February 2004 meeting. In addition, the Commission had before it a large, detailed record. The evidence does not support a finding that the Commission did not consider the proposed conveyance ab initio.

The evidence does not support any finding to the effect that the Commission has routinely violated the law with regard to such dinners. There is no evidence that meetings occurred during such dinners nor that they went "secret," as Flying J contends. To the contrary, the Administrative Record shows that the time and place of such dinners was included in the notices of the Commission's meetings. Moreover, Government Code

28

§ 11122.5, subdivision (5), expressly allows "[t]he attendance of a majority of the members of a state body at a purely social or ceremonial occasion, provided that a majority of the members do not discuss among themselves business of a specific nature that is within the subject matter jurisdiction of the state body."

Flying J contends that there was a violation of Government Code § 1090 due to Lawson's participation in the Commission's decision to disapprove the proposed conveyance to Flying J.  Government Code § 1090 provides, in pertinent part, that "... state... officers... shall not be financially interested in any contract made by them in their official capacity, or by anybody or board of which they are members."  There is no evidence that Lawson or the Commission entered into any such contract as a result of any action on the part of the Commission. The Commission's decision in February 2003 constituted a disapproval of the proposed conveyance to Flying J.  As a matter of fact, following the February 2003 decision, Caltrans and Flying J were free to renegotiate an agreement, but Flying J refused to do so.  As a result of Flying J's refusal to do so, state law required Caltrans, "to the greatest extent possible..." to attempt to dispose of the property through a competitive sale process. that it was possible to do so is evident from the fact that several bidders participated at the auction in May 2003.

As for Caltrans, a writ of mandate is an improper remedy to enforce a contract, and other than as may exist in contract, there is no other duty owed by Caltrans making it subject to a remedy sought in this proceeding.

Flying J appealed the denial of the petition for writ of mandamus to the Court of Appeal.  The Fifth District Court of Appeal affirmed the Superior Court, *Flying J., Inc. v. California Transportation Commission,* 2007 WL 926648 (2007),  ruling in

pertinent part:

> Respondent California Department of Transportation (Caltrans) brought an eminent domain action against appellant Flying J, Inc. (Flying J).  Caltrans wished to acquire 4.4 acres of Flying J's property for construction of a frontage road as part of a project known as the "Route 58 Mojave Bypass Project" located at the intersection of state highways 58 and 14 in Mojave.  This 4.4 acres was part of a larger 18.8 acre parcel owned by Flying J.  Caltrans owned a 20.57 acre parcel located adjacent to Flying J's 18.8 acre parcel.  Caltrans no longer needed its 20.57 acre parcel.  Caltrans and Flying J reached an agreement to settle the eminent domain action.

> Under the terms of the settlement, Flying J would convey to Caltrans the 4.4 acre parcel Caltrans sought for its project.  This parcel was valued at $14,800.  Caltrans would convey to Flying J the 20.57 acres Caltrans no longer needed.  This parcel was valued at $55,000.  Flying J would pay Caltrans the $40,200 difference between the values of the two properties, plus an additional $47,754 described in the settlement agreement as "the amount necessary for Contractor to implement the Construction Change Order required to remove said [20.57 acre] parcel ... from the area delineated for excavation by the State's Contractor."  The end result would be that Flying J would have a contiguous 34.9 acres (the 20.5 from Caltrans plus the remaining 14.4 acres of its original 18.8 acre parcel) for a "travel plaza" Flying J wished to construct there, and Caltrans would have the 4.4 acres it wanted for its frontage road.  The settlement agreement described the proposed conveyance of the Caltrans 20.5 acres to Flying J as being "[s]ubject to approval by the California Transportation Commission."  Caltrans dismissed its eminent domain action, apparently anticipating that the California Transportation Commission (respondent Commission or the Commission) would approve the conveyance.

> The Commission refused to approve the

30

conveyance of the 20.5 acres to Flying J. The 20.5 acre parcel was later auctioned by Caltrans at a public auction.  The winning bid at the auction for this parcel, which Caltrans and Flying J had valued in their settlement agreement at $55,000, was $377,000.  At least six different persons or entities placed bids at the auction. Nineteen bids of $300,000 or higher, by a total of four different bidders, were placed on the property.  Four of these bids were placed by Flying J's own agent (bidder No. 654), whose high bid was $350,000.  Seven bids higher than $350,000 were placed, by a total of three different bidders.  The winning bidder was Thomas Pistachio [sic]. The second and third highest bidders placed bids of $376,000 and $371,000, respectively.

Flying J sued Caltrans for breach of contract (the settlement agreement, also referred to by the parties as the Right of Way Contract). Caltrans also refiled its eminent domain action against Flying J to acquire the 4.4 acres.  The present appeal arises from neither of these two actions, but rather from a third one-Flying J's unsuccessful superior court petition for a writ of mandate directing the Commission to approve the settlement agreement's proposed conveyance of the 20.5 acre parcel to Flying J.  As we shall explain, the Commission had no mandatory duty to approve a conveyance of state property valued by Caltrans and Flying J at $55,000 when in fact that same property could be and was auctioned off for almost seven times that much ($377,000).  The court therefore did not err in denying Flying J's petition.

PROCEEDINGS BEFORE THE COMMISSION

*The Commission's October 3, 2002 Meeting*

The issue of possible approval of the conveyance of the 20.5 acres to Flying J first came before the Commission as one of at least 81 items or matters on the Commission's October 3, 2002 calendar.  Four of the eight commissioners present at the October 3 meeting of the Commission asked questions of

Caltrans representative Steve Ikeda about the proposed conveyance.  Among them was Commission John Lawson's question "Are we selling them 20 acres for 55 thousand dollars [$55,000]?"  Ikeda answered "Yes, we are." After Ikeda told the Commission that this conveyance was part of a settlement, Commissioner Allen Lawrence stated "Not at that price?"  Ikeda responded "Yes-well, that is the value of the property that we're selling to them."  Ikeda then explained that Caltrans would be receiving from Flying J $40,200 in cash and "property that's valued at 14 thousand 8 hundred [$14,800]." Commissioner Lawson asked "And how many acres are you acquiring?"  Ikeda responded "Oh-I don't have that information with me."  After Ikeda added "I can get that for you" and said that the property was along a highway, Lawson stated: "And business property doesn't sell for 2 thousand 750 dollars [$2,750] an acre....  I don't understand the deal.  Is there any way we can pull this and put it on next month?"  Commissioner Lawrence and Commission Chair Dianne McKenna expressed agreement with this course of action. McKenna then added: "We'll get all the information.  I think we're talking about having all the information in front of us. If we bring it back next month with, you know, what's involved if we bring - what the lawsuit was, what the settlement - all of that information, then we'll understand." Ikeda stated "Okay, fine, I'll have it for you next time."

Commissioner Chair McKenna then solicited a "motion to approve the other remaining items on 43."  Commissioner R. Kirk Lindsey so moved.  Commissioner Lawson seconded the motion, and the motion then passed by a vote of eight to zero.  Commission Chair McKenna then stated "So the [Flying J Matter] will be brought back."

*The Commission's February 27, 2003 Meeting*

The Commission considered the proposed conveyance once again at the Commission's February 27, 2003 meeting.  In connection with this meeting, Caltrans Chief Financial

Officer Robert L. Garcia addressed a memorandum to the Commission.  The memorandum stated in part: "The department is presenting a Director's Deed for the sale of 20.57 acres of excess, state-owned real property, adjacent to State Route 14 in Kern County. ... [¶] The Commission's approval of the attached Director's Deed would allow the sale of the property .. for the approved appraisal value of $55,000.  Under the terms of the Right of Way Contract, State is receiving the full amount of the appraised market value in a combination of cash and property.... [¶] The State is receiving payment from the buyer, Flying J, in the form of cash ($40,200) and the conveyance of 4.426 acres of property required for the State's highway project – the value of which is $14,800, including statutory interest – for a total consideration of $55,000."  The Garcia memo also stated that after the October 2002 Commission meeting Caltrans had offered to give Flying J 4.4 acres of the Caltrans 20.5 acre parcel in exchange for the 4.4 acres of Flying J property Caltrans wanted for its project.  The memo added that Flying J had rejected this attempt to "renegotiate the settlement" and "has deferred the Department's offers of renegotiation pending the Commission's action on the original proposed settlement."  In short, Flying J still wanted the 20.5 acres for $55,000.

The appraisal relied on by Flying J to value the 20.5 acres at $55,000 stated that "[t]his appraisal report has been prepared for the exclusive benefit of" two named attorneys representing Flying J.  The portion of the appraisal report documenting comparable sales stated that Flying J purchased its own 18.8 acre parcel (containing the 4.4 acres Caltrans sought to acquire) in 1997 for the $15,000 per acre price of $282,000.  A 20.5 acre parcel valued at $15,000 per acre (even six years later) would thus be worth $307,500.  The appraisal report downplayed the significance of this 1997 sale as follows:  "Sale 3 is the acquisition of the Flying J parcel prior to the development of the Freeway 58 Mojave Bypass Project. However, it was purchased with the

33

understanding that there was a high
probability that the freeway would be
developed at this location.  In consideration
of this factor, the buyer paid a significant
premium.  This is well above market levels as
established by sales comparisons."

At the February 27, 2003 Commission meeting,
Mr. Terrence Bride of Flying J spoke in favor
of approving the conveyance of the 20.5 acres
to Flying J.  He stated that approval of the
conveyance would settle the eminent domain
action, allow Flying J to build the "travel
plaza" Flying J wished to build at the site,
provide 89 new jobs, and bring two to three
hundred thousand dollars of new sales tax
revenue to Kern County.  He asserted that the
value of the property was $55,000.  Caltrans
representative Steve Ikeda told the
Commission essentially the same thing Garcia
had told the Commission in his memo – that
Flying J wanted the property for $55,000 and
would not renegotiate, at least not until the
Commission disapproved the proposed
conveyance.  Ikeda said:  "The Department is
presenting this item subject to the
contractual obligations to Flying J, and
seeks Commission approval.  We are aware of a
possible perception of an immediate windfall
to the buyer based on the potential for
speculative trends after the completion of
the State's highway project, the Mojave
Bypass. [¶] Subsequent to entering into this
agreement, the Department staff attempted to
renegotiate with Flying J, recognizing the
perception.  Flying J, however, has deferred
the Department's offers of renegotiation
pending the Commission's action on the
original settlement."

In response to Mr. Bride's comments,
Commission Chair R. Kirk Lindsey
stated:  "You know I've heard very clearly
the interest in the community and in economic
development, jobs, and certainly appreciate
that.  What I still haven't got is why you
are opposed to going out to bid on this
thing?"  Bride responded that Flying J had
negotiated in good faith, had "come to an
agreement" and "essentially we're prepared to
walk from the project."  Commissioner John

34

Lawson described this position as:  "It's your way or the highway.  Nah.  It's your way or the desert."  Commissioner Allen Lawrence pointed out to Mr. Bride that the written settlement agreement, by its own terms, stated that the proposed conveyance of the 20.5 acres to Flying J was subject to CTC approval.  Bride stated "[i]t most definitely does, and that's way we've come here today to culminate that arrangement...."  Even though approval of the conveyance would have increased the size of Flying J's parcel from 18.8 acres to 34.9 acres (18.8 minus the 4.4 going to Caltrans under the settlement agreement, plus the 20.5 acre excess parcel to be conveyed by Caltrans to Flying J under the settlement if this conveyance were approved by the Commission), Bride argued that Flying J "was damaged" by the proposed taking by Caltrans of the 4.4 acres of Flying J property Caltrans would acquire under the settlement agreement.  Bride stated "We had requested one hundred and seventy-five thousand [$175,000] in damages."  This appears to have been an argument that even if the Commission viewed the $55,000 valuation of the 20.5 acres to be low, the Commission should approve the conveyance anyway because Flying J was foregoing $175,000 in "severance damages" for its loss of the 4.4 acres to be acquired by Caltrans for its frontage road. Nothing in the settlement agreement itself, however, acknowledges the existence of any such severance damages.  Bride also told the Commission "given that we have been damaged, we will not participate in a bidding situation.["]

Commissioner Lawson moved to "put it out to bid."  Commissioner Lawrence seconded the motion.  The motion passed by a vote of 7 to 1.

The 20.5 acres were then auctioned off by Caltrans in May of 2003.  As we have already stated, the winning bid was $377,000.  Flying J did participate in the auction, through an agent, but was outbid.  The winning bidder, Mr. Pistachio [sic], was sued by Flying J in the United States District Court for the Eastern District of California in November of

2003 for intentional interference with
contract and other causes of action.

*The Commission's February 26, 2004 Meeting*

The Commission was asked to, and did,
reconsider in February of 2004 the proposed
20.5 acre conveyance to Flying J.  Flying J
claimed that because Commissioner Lawson had
an ongoing business relationship with the
winning bidder (Thomas Pistachio [sic]),
Lawson should not have participated in the
Commission's decision on whether to approve
the proposed conveyance of the 20.5 acres to
Flying J.  Commissioner Lawson's term on the
Commission had ended after the Commission's
February 2003 meeting.  The February 2004
Commission first decided whether to
reconsider the proposed conveyance to Flying
J, without making any determination regarding
the propriety of any previous Commission
action concerning the proposed conveyance.
The motion to reconsider, made by
Commissioner Jeremiah Hallisey and seconded
by Commissioner Jim Ghielmetti, carried by a
vote of six to zero.  The Commission then
heard arguments as to whether it should or
should not approve the proposed conveyance.
Commissioner Hallisey then moved that the
Commission reject the proposed conveyance to
Flying J.  Commissioner Allen Lawrence
seconded the motion, and the motion passed
six to zero.

THE SUPERIOR COURT ACTION

In March of 2004 Flying J filed its superior
court action seeking a writ of administrative
mandamus (first cause of action), a writ of
traditional mandamus (second cause of
action), and declaratory and injunctive
relief (third cause of action).  Flying J
sought to have the superior court direct the
Commission to (1) "invalidate the
Commission's decisions disapproving a
conveyance to Flying J of" the subject 20.5
acre parcel, (2) "invalidate Caltrans
subsequent sale of the real property," and
(4) "approve the conveyance of" the 20.5
acres to Flying J and "direct Caltrans to
deliver to Flying J a Director's Deed" to the

36

20.5 acre parcel.  Flying J also sought to have the court direct the Commission to (3) "conduct the Commission's proceedings without violating California's conflict of interest or open meeting laws."  Although Flying J's superior court action named both the Commission and Caltrans as respondents, it does not appear to have sought any actual relief against Caltrans.  The court sustained, without leave to amend, demurrers by the Commission and Caltrans to Flying J's first (administrative mandamus) cause of action.  The parties submitted briefing and documentary evidence.  The court held a hearing, heard oral argument, and took the matter under submission.  The court then ruled against Flying J on the remaining two causes of action, and entered judgment in favor of the Commission and Caltrans.

Flying J's appeal to this court argues that Flying J did not receive a fair hearing before the Commission, and that the court therefore erred in refusing to order the Commission to invalidate the Commission's disapproval of the proposed conveyance of the 20.5 acres to Flying J.  As we shall explain, we disagree with Flying J, and we agree with the superior court's conclusion that Flying J is not entitled to any relief.

STANDARD OF REVIEW

*The Commission*

The California Transportation Commission was established in 1978 as part of the Alquist-Ingalls Act.  (Stats. 1977, ch. 1106; Gov. Code § 14500 et seq.)  The Legislature's stated intent in enacting this legislation was: "to reform the state transportation program by all of the following:  [¶] (a) Simplifying and clarifying the transportation planning and programming process.  [¶] (b) Consolidating the various transportation boards and commissions into a single planning and fund allocation commission. [¶] (c) Increasing the responsibility and effectiveness of the role of the Legislature in deciding state transportation policy and budgeting."  (Stats. 1977, ch. 1106, § 2, pp.

37

3531-3532.)  The California Transportation Commission replaced and assumed the responsibilities of four previously existing bodies: the State Transportation Board (gov. Code, § 13990), the State Aeronautics Board (Pub. Util. Code § 21215), the California Highway Commission (Sts. & Hy. Code § 70), and the California Toll Bridge Authority (Sts. & Hy. Code § 30050).  (Stats. 1977, ch. 1106, §§ 9, 29, 36, 63.)

The Commission consists of nine members appointed by the Governor, with the advice and consent of the state Senate, to staggered four-year terms, plus two non-voting ex-official members.  (Gov. Code §§ 14502 & 14503.)  The non-voting members are a member of the state Senate appointed by the Senate Rules Committee and a member of the state Assembly appointed by the Speaker of the Assembly.  (Gov. Code § 14502.)

Pertinent to this appeal is the Commission's function of approving conveyances of state properties owned by the state but no longer needed for highway purposes.  In California's Streets and Highways code, the term "department" means "the Department of Transportation of this state" (i.e., Caltrans) (Sts. & Hy. Code § 20), and "[u]nless the particular provision or the context requires otherwise, 'commission' means the California Transportation Commission."  (Sts. & Hy. Code § 22.)  The term "director" means the director of the Department of Transportation.  (Sts. & Hy. Code § 21.)  The Commission's approval function appears in section 118 of the Streets and Highways Code.

Subdivision (a) of section 118 states in pertinent part: "Whenever the department determines that any real property or interest therein, previously or hereafter acquired by the state for highway purposes, is no longer necessary for these purposes, the department may sell, contract to sell, sell by trust deed, or exchange the real property or interest therein in the manner and upon terms, standards, and conditions established by the commission."  Subdivision (b) of

38

section 118 states: "Any conveyance under
this section shall be approved by the
commission and shall be executed on behalf of
the state by the director and the purchase
price shall be paid into the State Treasury
to the credit of any fund, available to the
department for highway purposes, which the
commission designates."  Subdivision (c) of
section 118 states:  "Any such real property
or interest therein may in like manner be
exchanged, either as whole or part
consideration, for any other real property or
interest therein needed for state highway
purposes."  The key words of this section are
the subdivision (b) worlds "[a]ny conveyance
under this section shall be approved by the
commission...."  The conveyance of the 20.5
acres could not take place without the
Commission's approval, and Flying J was
unsuccessful in its attempt to obtain that
approval.

*Judicial Review of The Commission's Decisions*

Administrative decisions are classified as
either quasi-legislative or quasi-judicial
(sometimes also called "adjudicatory").
(*Western States Petroleum Assn. v. Superior
Court* (1995) 9 Cal.4th 559, 566-567, 38
Cal.Rptr.2d 139, 888 P.2d 1268.)  Quasi-
judicial or "adjudicative" administrative
decisions have been described as "'decisions
that determine what the facts are in relation
to specific private rights or interests.'"
(*Western States Petroleum Assn. v. Superior
Court, supra*, 9 Cal.4th at p. 567, 38
Cal.rptr.2d 139, 888 P.2d 1268) and reviewed
by a petition for administrative mandamus
under the standard of review described in
Code of Civil procedure section 1094.5
(*Western States Petroleum Assn. v. Superior
Court, supra*, 9 Cal.4th at pp. 566-567, 38
Cal.rptr.2d 139, 888 P.2d 1268.)  Other
administrative decisions are quasi-
legislative and are reviewed under the so-
called "traditional mandamus" standard set
forth in Code of Civil Procedure section
1085.  (*Western States Petroleum Assn. v.
Superior Court, supra*, 9 Cal.4th at pp. 567-
568, 38 Cal.Rptr.2d 139, 888 P.2d 1268.)"
There is no doubt that a public agency's

decision to sell a piece of property it wishes to dispose of is nonadjudicatory in character, so Code of Civil Procedure section 1085 applied."   (*Friends of the Sierra Railroad v. Tuolumne Park and Recreation District* (2007) 147 Cal.App.4th 643, 652, 54 Cal.Rptr.3d 500.)

"A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins...." (Code Civ. Proc. § 1085, subd. (a).)   This code section "permits judicial review of ministerial duties as well as quasi-legislative acts of public agencies." (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1264-1265, 4 Cal.Rptr.3d 536.)   We are not concerned in this case with the performance of any ministerial duty.   We are concerned with the Commission's refusal to approve the proposed conveyance of the 20.5 acres to Flying J. "In reviewing such quasi-legislative decisions, the trial court does not inquire whether, if it had the power to act in the first instance, it would have taken the action taken by the administrative agency. The authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair."   (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786, 187 Cal.Rptr. 398, 654 P.2d 168 (disapproved on another ground in *board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918, 13 Cal.Rptr.2d 245, 838 P.2d 1198); in accord, see *Pitts v. Perluss* (1962) 58 Cal.2d 824, 833, 27 Cal.Rptr. 19, 377 P.2d 83.).)   "Traditional mandamus may be used to compel an agency to exercise its discretion but not to control it, i.e., to force the exercise of discretion in a particular manner or to reach a particular result."   (*Carrancho v. California Air Resources Board, supra*, 111 Cal.App.4th at p. 1268, 4 Cal.Rptr.3d 536.)

Although Flying J, on the last page of its brief, asks us to "order approval of" the

proposed conveyance to Flying J, nothing in
Flying J's brief even attempts to explain why
any court would have any legal obligation to
direct the Commission to exercise its
discretion to approve the proposed
conveyance.   Section 118 gives the discretion
to approve or not to approve to the
Commission, not to any court.   The thrust of
Flying J's brief to this court appears to be
an argument that the Commission's proceedings
were "unlawfully or procedurally unfair"
(*Fullerton Joint Union High School Dist. v.
State Bd. of Education, supra*, 32 Cal.3d at
p. 786, 187 Cal.Rptr. 398, 654 P.2d 168.)
This is the primary argument that was raised
by Flying J in the superior court.   Flying J
contended that the Commission's proceedings
were tainted because Commissioner Lawson was
a personal friend of winning bidder Thomas
Pistachio [sic] and had business dealings
with Pistachio [sic].   Flying J also raised
this argument at the February 2004 Commission
meeting where the Commission reconsidered
whether to approve the proposed conveyance.
The Commission at its February 2004 meeting
expressly did not address the question of
whether its prior proceedings had been fair
or unfair.   It simply reconsidered the
proposed conveyance anew at a time when
Lawson was no longer a member of the
Commission, and exercised its discretion not
to approve the proposed conveyance.   The
superior court found no unfairness.

"In reviewing the denial of a petition for
writ of mandamus, whether under Code of Civil
Procedure section 1085 or section 1094.5, we
review questions of law de novo."   (*Fry v.
Saenz* (2002) 98 Cal.App.4th 256, 262, 120
Cal.Rptr.2d 30.)   In the traditional mandamus
case of *Cosgrove v. County of Sacramento*
(1967) 252 Cal.App.2d 45, 59 Cal.Rptr. 919,
the court stated: "All presumptions usually
made by an appellate court in considering
appeals apply to a proceeding in mandamus.
[Citation.]   The judgment is presumed to be
correct, and the burden is on appellant to
show reversible error. [Citations.] The
presumption that public officials have
performed their duty as required by law is
applicable. [Citation.] [¶] The duty of

41

determining questions of fact in proceedings
in mandate heard below is for the trial
court. [Citations.] [¶] Findings of the lower
court will not be disturbed by the appellate
court if they are based on substantial
evidence even though the evidence is
conflicting." [Citations.] (*Id.* at pp. 50-51,
59 Cal.Rptr. 919.)

THE PETITION WAS PROPERLY DENIED

Flying J raises five arguments on this
appeal.  It designates these in its brief as
arguments "A" through "E."  We will address
each of these, but before we do so, we deem
it prudent to emphasize what appears to us to
be by far the most salient aspect of this
case - the fact that the Commission in
February of 2004, when Lawson was no longer a
Commission member, reconsidered the proposed
conveyance of the 20.5 acres to Flying J and
refused to approve that proposed conveyance.
All of Flying J's voluminous argument about
what it deems to be a bias or impermissible
interest of Lawson simply no longer mattered
after the commission decided in February of
2004, at the request of Flying J, to
reconsider anew the proposed conveyance on
its merits.  Flying J was successful in its
attempt to have the Commission reconsider the
proposed conveyance, but was unsuccessful on
that reconsideration in its attempt to
persuade the Lawson-less Commission to
approve the proposed conveyance.

The Commission's February 2004 refusal to
approve the proposed transaction was simply
an exercise of the Commission's quasi-
legislative discretion.  After the Commission
entertained argument on the proposed
conveyance, Commissioner Hallisey moved to
adopt the staff recommendation.  That
recommendation, recited by Commission staff
member Stephen Maller, was: "The Staff
recommends that the Commission reject the
proposed conveyance to Flying J.  The
proposed conveyance is in conflict with the
terms, standards and conditions as
established by the Commission in its
procedures for sale of excess property under
Resolution G98-22.  [¶] In addition, the

42

proposed conveyance is based on an appraisal
with substantive flaws."  The second one
especially is, frankly, somewhat
overwhelming.  Several bidders (including
Flying J itself, through its agent Lee
Pulsipher) had already bid more than $300,000
on the 20.5 acre parcel that was valued in
the settlement agreement at $55,000.  And the
appraisal relied on for that valuation
essentially downplayed the fact that Flying J
itself had paid $282,000 ($15,000 per acre)
for its own adjacent 18.8 acre parcel in
1997.

We should also mention here that there is no
dispute that the subject 20.5 acres has not
been sold to Pistachio [sic].  Pistachio's
[sic] winning bid earned him an option to
purchase the property if certain conditions
were met.  As with any conveyance of excess
property, any sale to Pistachio [sic] would
be subject to approval by the Commission.
(§ 118.)  Indeed, the bid form signed by
Pistachio sates "bidder understands and
agrees that this option is subject to the
approval of the California Transportation
Commission...."  The Commission's brief to
the superior court also informed the court:
"There has never been a sale of the property.
The state still owns it.  No request for
approval of any conveyance of the property
has been made...."  In short, there was
nothing to prevent the Commission from
approving the proposed conveyance of the 20.5
acres to Flying J at the February 2004
Commission meeting of the Commission had
chosen to exercise its discretion to do so.

A.   Flying J's Argument that "Neither
     Streets & Highways Code Section 118 Nor
     Any Commission Resolution Precluded the
     Commission From Approving the Property
     Exchange As A Matter of Law"

The superior court's statement of decision
stated in part:  "The proposed conveyance did
not comply with Streets and Highways Code
section 118 or with the guidelines adopted by
the commission pursuant to that section, and
as a consequence the Commission did not have
the authority to disapprove it."  The

43

statement of decision also added: "However, even if the Commission otherwise had the authority to approve a conveyance of the property, it was within its discretion to disapprove it for other reasons."  Flying J's argument "A" pertains to the first of these two sentences.  Subdivision (a) of section 118 provides that "the department may sell, contract to sell, sell by trust deed, or exchange the real property or interest therein in the manner and upon terms, standards, and conditions established by the commission."  Pursuant to this statutory authority the commission adopted its Resolution G-98-22 entitled "Procedure For Sale of Excess Property."

Paragraph 2.1 of Resolution G-98-22 permits a sale of "the excess parcel to the owner of adjoining property without the necessity of calling for competitive sealed bids or selling same at public auction" when certain "facts ... exist pertaining to such excess parcel."  There are two sets of such "facts."  One set of such facts is labeled "Finding A" and the other is labeled "Finding B."  A sale to the adjoining owner without competitive sealed bids or a public auction is authorized "whenever the Department of Transportation finds and determines that the following facts either under Findings A or B exist pertaining to such excess parcel."  For purposes of this appeal, all that matters about Paragraph 2.1 is that the parties agree Paragraph 2.1 does not authorize a sale to Flying J without competitive sealed bids or a public auction because "facts under either findings A or B" do not "exist" pertaining to the 20.5 acre parcel at issue here.  Flying J relies on Paragraph 2.3 of Resolution G-98-22. Paragraph 2.3 states:

"THEREFORE BE IT FURTHER RESOLVED, that in all cases other than sales to adjoining landowners, either under Finding A or Finding B, or sales to public agencies, excess property shall be either sold by receipt of competitive sealed bids, or by sale at public auction, or exchanged for other land required

44

1        for transportation purposes...."

2            Flying J contends that under the terms of the
         proposed conveyance of the State's excess
3        20.5 acres to Flying J, the 20.5 excess acres
         would be "exchanged for other land required
4        for transportation purposes," namely the 4.4
         acres the state would receive from Flying J
5        along with the $40,200 monetary payment.
         Both the Commission and the court were of the
6        view that the proposed conveyance was not an
         "exchange" because 73 percent of the
7        consideration for the 20.5 acres to be
         conveyed to Flying J was cash (the $40,200)
8        and only 27 percent was "other land required
         for transportation purposes" (i.e., the 4.4
9        acres valued at $14,800 to be conveyed by
         Flying J to the state for the highway project
10       frontage road).  The Commission is entitled
         to some discretion in its interpretation of
11       its own resolution.  It acted well within
         that discretion in concluding that the
12       proposed conveyance would not be an
         "exchange" within the meaning of the
13       Paragraph 2.3 words "excess property ...
         exchanged for other land required for
14       transportation purposes."  We also note that
         Flying J unquestionably could have had an
15       "exchange" within the meaning of Paragraph
         2.3 if Flying J had accepted the Caltrans
16       offer of 4.4 acres of the state's excess 20.5
         acres in exchange for the 4.4 acres the state
17       wished to acquire from Flying J for the
         state's project.  Flying J rejected this
18       offer.

19           More importantly, however, even if we could
         conclude that the proposed conveyance were
20       authorized by Paragraph 2.3 of Resolution G-
         98-22, the proposed conveyance was still
21       subject to Commission approval.  (§ 118.)
         Lack of compliance with Resolution G-98-22
22       was not the only reason the Commission did
         not approve the proposed conveyance.  The
23       other reason was that the Commission was
         unwilling to approve the conveyance of the
24       20.5 acres to Flying J for $55,000 ($40,200
         in cash plus 4.4 acres of property valued at
25       $14,800) when several interested potential
         buyers, including Flying J itself, had bid
26       more than $300,000 on the property.

45

Throughout the Commission proceedings, this undervaluation of the 20.5 acres appears to have been the primary concern of the Commission in its consistent refusal to approve the proposed conveyance.  The Commission's refusal to approve the proposed conveyance was not "arbitrary" or "capricious" or "entirely lacking in evidentiary support."  (*Pitts v. Perluss, supra*, 58 Cal.2d at p. 833, 27 Cal.rptr. 19, 377 P.2d 83.)

B.   Flying J's argument that "The Trial Court Erred In Failing To Invalidate An Auction That Was Conducted Solely and Exclusively Because The Commission Issued An Order That Admittedly Exceeded Its Own Powers"

As we have already explained, the Caltrans auction in no way prevented the Commission from approving the proposed conveyance to Flying J.  Flying J seizes upon the Commission's admission that the Commission has no authority to order Caltrans to conduct an auction, but Flying J ignores altogether the apparent authority of Caltrans to conduct such an auction.  Flying J calls our attention to no law violated by Caltrans in conducting the auction.  We also note that Flying J did not object to the auction when it took place in May of 2003, or take any steps to stop it, but instead participated in the auction through an agent who placed a $350,000 bid on the property.  Flying J's superior court petition asked the court to issue a writ of mandate "ordering the commission to ... invalidate Caltrans' subsequent sale of the real property."  As we have already pointed out, there has not yet been any sale of the 20.5 acres, and any such sale would be subject to Commission approval. Nor has Flying J called our attention to any law which would authorize (much less require) the Commission to invalidate any auction conducted by Caltrans.

C.   Flying J's argument that "The Trial Court Failed To Apply A De Novo Standard Of Review To The Claim of Procedural Impropriety - The Same Standard of

46

Review This Court Now Applies"

Flying J cites to no portion of the superior court's statement of decision to support this argument.  More importantly, Flying J points to no procedural impropriety at all in the Commission's February 2004 refusal to approve the proposed conveyance to Flying J.  Under this heading "C" Flying J then argues that the court's evidentiary rulings were erroneous.  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice...."  (Evid. Code § 354.)  A miscarriage of justice "'should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069, 232 Cal.Rptr. 528, 728 P.2d 1163.)  Flying J argues that the court "rejected all evidence outside the administrative record," but calls our attention to no ruling by the court stating that the court would refuse to admit evidence outside the administrative record.  Indeed, the Commission's counsel expressly told the court that the Commission was not objecting to any otherwise admissible extra-record evidence offered by Flying J "that might pertain to an alleged procedural irregularity."  The Commission also repeated this position in its written argument to the court.  Whatever objections were sustained were sustained on other grounds.

The evidence Flying J claims was erroneously excluded appears to have pertained to its contention that Commissioner Lawson should not have participated in any Commission decision regarding the proposed conveyance. Flying J makes no attempt to explain how exclusion of this evidence caused Flying J any prejudice, given that the Commission

47

reconsidered and again disapproved the proposed conveyance a year after Lawson's term on the Commission ended.  (The trial court's statement of decision also stated:  "Putting aside its inadmissibility, the evidence offered by Flying J still does not compel the conclusion that Lawson had a conflict of interest."  The court then gave its reasons for reaching this conclusion.)

Flying J further argues that the trial court violated its right to due process by sustaining objections to its evidence "without affording Flying J an opportunity to be heard."  In fact, however, the court held a hearing on Flying J's petition and also received extensive written briefing on objections made by all parties.  After the parties had rested and after the court had issued a proposed statement of decision (on which the court also held a hearing), Flying J requested another opportunity to submit additional evidence.  Due process requires an opportunity to be heard, but it does not require an opportunity to be heard twice.

D.   Flying J's argument that "Statutory And Common Law Prohibit Lawson's Actions And compel A Conflict Of Interest Finding"

Under this heading Flying J again argues that the evidence presented showed a conflict of interest on the part of Commissioner Lawson prohibiting him from lawfully participating in the Commission's decision on whether to approve the proposed conveyance to Flying J. Again we reiterate that in February 2004 the Commission, without Lawson as a member, voted not to approve the proposed conveyance.  Thus even if we were to assume (without deciding) that Commissioner Lawson had such a conflict of interest, Flying J has failed to show how the superior court erred in concluding that Flying J was entitled to no relief.

E.   Flying J's argument that "Lawson's Conflict of Interest Was Not Harmless Error Nor Cured By Reconsideration"

The trial court concluded [e]ven if it is assumed that Lawson had a conflict of

48

interest which should have precluded his participation at the February 2003 meeting, the proper remedy would depend on whether the commission would have reached a different decision in the absence of Lawson['s] participation or whether Lawson's vote was essential to the adoption of the decision." The court then concluded that given the Commission's seven to one vote against approval, "there is no evidence of any kind to support a finding that a different decision would have been reached absent Lawson's participation."  Flying J argues that this conclusion was legally incorrect and that the February 2003 decision should be nullified.  The argument is inconsequential because the Commission reconsidered the proposed conveyance anew in February of 2004 without Lawson as a member and again disapproved the proposed conveyance.

The superior court also concluded: "The February 2004 reconsideration cured any defects affecting the earlier decision. There is no evidence of any conflict of interest in connection with the February 2004 meeting."  Flying J disputes this conclusion and argues that "[n]othing about the reconsideration hearing indicated any true re-evaluation of" the proposed conveyance. This is simply incorrect.  At the February 200r meeting Commissioner Hallisey expressly moved to reconsider the proposed conveyance. The motion passed unanimously.  Flying J argues that the Commission could not lawfully reconsider the proposed conveyance in February 2004 without first setting aside its February 2003 decision.  Flying J does not call our attention to anything in section 118 or in any other law, however, that would bar the Commission from approving the proposed conveyance to Flying J in February of 2004 after already once having refused to approve the proposed conveyance in February of 2003. We see nothing in *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 56 Cal.Rptr.2d 223, which supports Flying J's argument.  In *Clark* a City Council denied the Clarks a building permit by a vote of three to two.  The Clarks then persuaded the court that one of the voting council members was

49

> biased against them.  "The trial court set
> aside the Council's decision and ordered the
> City to reinstate the planning commission's
> approval of the Clark's permits.  This was
> error.  The trial court should have ordered
> the Council to rehear the matter and to
> provide the Clerks with a fair hearing."
> (*Clark v. City of Hermosa Beach, supra*, 48
> Cal.App.4th at p. 1174, 56 Cal.rptr.2d 223,
> fn. omitted.)  In the present case the
> Commission, on its own initiative, voted to
> rehear and did rehear the matter after Lawson
> was no longer on the Commission.  There was
> no error.
>
> DISPOSITION
>
> The judgment is affirmed.  Costs to
> respondents. [Footnotes omitted]

Flying J's petition for hearing to the California Supreme Court has been denied.  The Court of Appeals' decision is a *final* judgment that is dispositive of the issues of fact and law decided.

C.  <u>DEFENDANTS' MOTION TO DISMISS ACTION AS MOOT</u>.

Defendants move to dismiss the SAC for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, on the ground that the action is moot.

Defendants argue that the allegations in the SAC purporting to cast doubt on the independence of the CTC's 2004 reconsideration fail to establish that the original denial by the CTC of the conveyance played a causal role in the denial on reconsideration.

"A case becomes moot if (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the

50

effects of the alleged violation." *Texas Office of Public Utility Counsel v. F.C.C.*, 183 F.3d 393, 413-414 (5th Cir.1999), citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).

Defendants place primary reliance on *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215 (5th Cir.2006), *cert. denied*, 126 S.Ct. 40 (2007). In *Coliseum Square,* nonprofit organizations representing citizens, residents and merchants in New Orleans brought an action against the Housing Authority of New Orleans (HANO) and the United States Department of Housing and Urban Development (HUD) for judicial review, seeking declaratory judgment that HUD failed to comply with the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA) in funding a housing development revitalization project, and an injunction compelling HUD to withhold federal funds from the project until it fully complied with those statutes. Shortly after the lawsuit was filed, HUD voluntarily re-opened the NEPA process, which resulted in a new FONSI and MOA. The Fifth Circuit held in pertinent part:

> Corrective action by an agency can moot an issue ....
>
> In reopening the NHPA process, HUD took the voluntary action required to address plaintiffs' original claims. At the closure of that process, a second, final MOA was produced. As the St. Thomas project is no longer proceeding under the original version of the MOA, any remaining challenges to its validity have been mooted. The district court rightly disposed of claims against the final MOA ....

*Id.* at 246.

1    Defendants argue that Flying J has failed to allege activity

2  sufficient to show that any alleged conflict on interest by

3  Lawson with Pistacchio in 2003 during the CTC's 2003

4  consideration of the proposed transaction had a causal role in

5  the CTC's 2004 reconsideration of its denial of the conveyance.

6  Defendants contend that Flying J's allegations in Paragraphs 59

7  and 60 of the SAC that the CTC's reconsideration was not

8  independent are "mere conclusions".  Defendants argue that the

9  allegation in Paragraph 60 that "Lawson's continuing influence

10  over these commissioners is reflected by the fact that the CTC

11  expressly refused to consider whether Lawson had a conflict of

12  interest, or whether the CTC's prior order was improper" is

13  nonsensical given the allegation in Paragraph 64 that "[t]he CTC

14  has never been asked to consider, has never considered, and lacks

15  the authority to render any decision with respect to, Defendants'

16  wrongful and illegal conduct, as alleged herein, or the damages

17  to Flying J resulting therefrom."

18    Flying J argues that the 2004 CTC reconsideration does not

19  moot this action.  Flying J cites *GATX/Airlog Co. v. U.S. Dist.*

20  *Court for Northern Dist. of California,* 192 F.3d 1304, 1306 (9th

21  Cir.1999):

22         A case is moot only if interim events have
           completely and irrevocably eradicated the
23         effects of an allegedly improper ruling ...
           The party asserting mootness has the heavy
24         burden of establishing that there is no
           effective relief remaining for a court to
25         provide.

26  Flying J concedes that "there is some factual overlap between the

present case and the February 26, 2004, CTC hearing regarding the conveyance of the 20-Acre Parcel to Flying J."  Flying J contends that the claims made and the relief requested here are "very different."  Flying J asserts that it requested the CTC in February 2004 "to address and, if determined necessary, remedy the improprieties associated with the CTC's ultimate rejection of the conveyance of the 20-Acre Parcel to Flying J in February 2003."  Flying J asserts that the relief sought in the 2004 reconsideration hearing before the CTC was "the rectification of Lawson's and the CTC's improprieties of October 2002 and February 2003" and "the nullification of the May 2002 auction of the property and the approval by CTC of the conveyance of the 20-Acre Parcel to Flying J."  In contrast, Flying J argues, this action addresses whether Pistacchio and Lawson's conduct caused the CTC to disapprove the conveyance of the 20-Acre Parcel to Flying J resulting in the alleged deprivation of Flying J's rights and seeks damages and the recovery of the 20-Acre Parcel.

Flying J contends that the relief sought in this action is still available because Pistacchio is in possession of the right to purchase the 20-Acre Parcel and Flying J has suffered damages resulting from Defendants' allegedly unlawful conduct: "The CTC did not and could not address Flying J's claims in this action against Defendants or provide Flying J with the relief requested in this action."

Flying J argues that the allegations in Paragraphs 59-60 establish that the CTC's reconsideration "was another by-product

53

of Lawson's influence and improper conduct on the CTC approval process."  Although Lawson was not acting as a Commissioner during the 2004 reconsideration, Flying J asserts that "his cronies were."  Flying J refers to Lawson's deposition testimony that Allen Lawrence, who was one of the Commissioners presiding over the 2004 reconsideration, is Lawson's insurance broker and that Lawson and Lawrence discussed the possibility of doing business together while Lawson was still a Commissioner, and that Lawrence is currently the broker of record for several of Lawson's properties.

     As Defendants reply, despite being afforded leave to conduct further discovery, the only new factual allegation developed to show Lawson's allegedly continuing influence over the Commissioners hearing the 2004 reconsideration is that involving Lawrence's insurance business relationship with Lawson.  Flying J makes no allegation that Lawson ever spoke with Lawrence concerning the proposed conveyance or the reconsideration hearing after Lawson left the Commission, or that Lawson attempted to influence Lawrence in connection with the reconsideration hearing.  With regard to the allegation in Paragraphs 59-60, Defendants note that there is no allegation or evidence that Lawson even spoke to the Commissioners after the February 2003 hearing or that he spoke with the Commissioners prior to the February 2004 reconsideration hearing.

     Flying J argues that the CTC's 2004 reconsideration does not moot this action because, but for Defendants' alleged unlawful

conduct, the CTC would have approved the conveyance of the 20-Acre Parcel to Flying J in October 2002 or February 2003: "The alleged intervening event - the CTC's 2004 'reconsideration' of the conveyance - would have never occurred but for Defendants [sic] unlawful manipulation of the CTC processes in October 2002 and February 2003."[2]

Flying J contends that the 2004 reconsideration has "no effect" on the "CTC *ultra vires* order of February 2003 that Caltrans sell the 20-Acre Parcel at public auction and the resulting damage Flying J."  Flying J argues:

> This unauthorized order was the direct result of defendant Lawson's conflict of interest and a central component of Defendants' conspiracy to steal the 20-Acre Parcel from Flying J.  Had the CTC in February 2003 simply approved or rejected the conveyance to Flying J - which is all they were authorized to do - Pistacchio would not have had the opportunity to acquire the parcel.  The *ultra vires* order that the 20-Acre Parcel be

---

[2] **Flying J contends that the Ninth Circuit acknowledged "this fact", quoting a statement by Judge Reinhardt during oral argument of Flying J's appeal of Judge Coyle's order dismissing this action as moot. Defendants correctly object to Flying J's characterization of the Ninth Circuit's position.  The Ninth Circuit's order of reversal expresses no opinion on this issue:**

> **We express no opinion on how new allegations will play out, or whether it is necessary to reach them in order to decide the underlying case, but we cannot say at this stage of the proceedings that amendment would be futile. Flying J suggested ... that additional facts could be averred which would clearly show that the February 2004 decision was not independent and that it suffered compensable injury on account of Pistacchio's allegedly wrongful conduct.  Therefore, it should have the opportunity to amend.**

auctioned was necessary to pry open Flying
J's lock on the property and insure that
Pistacchio had an opportunity to acquire the
20-Acre Parcel.  Had the CTC not ordered the
parcel to be sold at public auction, Flying J
could have renegotiated the deal with
Caltrans to meet CTC approval.  Simply
stated, the CTC's February 2003 order to sell
the 20-Acre Parcel at public auction deprived
Flying J of the 20-Acre Parcel and the CTC's
February 2004 decision did not address or
remedy this fact.

Flying J's contention is mired in conflict of interest

contentions and an excursion into the nongermane; even accepting,

*arguendo*, as did both state courts that decided the conflict

issue, the prerequisite of causation remains; i.e., is there a

causal link between the alleged harm, disapproval of the sale to

Flying J, and the conflict of interest actions complained of by

Flying J?  That issue has been decided against Flying J as a

matter of law and affirmed on appeal:

Because the CTC elected to reconsider the
proposed conveyance almost an entire year
after Lawson left the Commission - at Flying
J's special request - and Flying J has failed
to allege facts showing the decision somehow
remained 'tainted,' this argument is of no
help to Flying J.

Flying J's contention that, had CTC not ordered the parcel to be

sold at public auction, Flying J would have renegotiated the deal

with Caltrans to meet CTC approval, is totally belied by the

record.  Following the February 2003 hearing, CTC staff informed

Caltrans representatives that Caltrans and Flying J could still

negotiate an equal exchange of properties.  Reference is made to

Exhibit D to the deposition Steven Ikeda of Caltrans:

> Immediately after the vote [at the February 27, 2003, CTC hearing] – I was seated at the table next to Stephen Maller [the CTC Liaison for Caltrans].  And immediately after the vote in the lull before the next item, I turned to him and I asked, 'Can we still exchange to make them whole and put the rest up for auction?'  And he said yes, he would support that.  And that was the basis for my statement here.  I clarified with CTC staff after the vote to ensure that we are still able to negotiate an even exchange.

Thereafter, representatives of Caltrans contacted Terrance Bride, Flying J's Project Director, to attempt to renegotiate an even-acre exchange with Flying J.  According to Caltrans' Right of Way Parcel Diary dated March 5, 2003:

> Nancy [Escallier of Caltrans] able to contact Terrance during lunch ... they [Flying J and their representatives] don't want 4 acre exchange – they don't want to bid on excess – they will just carry parcel on their inventory.

Caltrans' Right of Way Parcel Diary dated March 17, 2003 states:

> Nancy says Terrance ph[oned] Friday and they [Flying J and their representatives] do not want an even exchange – feels it would limite their options with damages.  DG. Phoned Phil Acosta [of Caltrans].  He said they are moving forward with public action.

Caltrans attempted to renegotiate with Flying J and only after Flying J's refusal to do so did Caltrans schedule the auction.

There is no dispute, factually or legally, that Flying J's proposed transaction with Caltrans was always subject to the Commission's approval; Flying J never had or has any absolute, unconditional "right" to purchase the 20-acre parcel under the terms of the Settlement Agreement with Caltrans.  The purchase of

57

public property was always subject to CTC approval.  The record
in this action demonstrates strong justification existed for
questions to be raised about the economic viability and fairness
of the proposed transaction, to the extent that the gross
disparity in value between the real property and money to be
provided by Flying J to pay for the significantly more valuable
state 20 acre parcel of real property, could be interpreted as an
unlawful gift of public property, the disparity in values is so
great.  This is borne out by the commission's concerns about
Flying J's appraisal submitted to support the valuation of the
transaction.  Competitive bidding laws are designed to protect
the public fisc by preventing public officials from awarding
contracts uneconomically to protect taxpayers from public
corruption and prevent waste of public funds.  *Assoc. Gen.*
*Contractors of California v. San Francisco Unified.*, 616 F.2d
1381, 1391 (9th Cir. 1990).  The CTC cannot be restrained from
open and public consideration of transaction.  A public body
cannot contract to "approve" by vote in advance.  This is a sale
of the public domain.  California Constitution Article XVI, § 6
prevents a gift of public funds.  *See Alameda County v. Ross*, 32
Cal.App.2d 135, 147 (1939)(a contract to improve a bridge and
grant a license to a railroad was illegal as an unlawful gift or
free contribution to the corporation and void for lack of
mutuality of obligations.)

     The party, Flying J, against which issue and claim
preclusion is asserted, has had full opportunity to fully and

1   finally litigate the alleged conflict of interest and the alleged
2   impropriety of Lawson's actions to deprive Flying J of an obvious
3   economic windfall at public expense in the forum of Flying J's
4   choice.  Flying J has had its day in court at the trial and
5   appellate levels.  Both courts fully analyzed and decided the
6   issue of alleged conflict of interest.  Further, appellate review
7   was denied.  Both state courts found the facts that Lawson was
8   off the Commission and had no vote on or wrongful role in the
9   Commission's rejection by disapproval of the proposed Flying J
10  transaction or decision to release the real property for sale at
11  public auction.  Both courts independently found that no
12  conflict, act or omission by Lawson or anyone associated or
13  acting in concert with him had any role in nor did it cause the
14  disapproval of the Flying J purchase.  It has been completely and
15  finally adjudicated that there is a total absence of causation
16  for Plaintiff's claims and failure of proof that any Defendant
17  engaged in any wrongful act or omission that caused Flying J to
18  lose the purchase of the 20.4 acre parcel.

19       Flying J ignores the infirmity of its fundamental premise
20  that the Caltrans settlement agreement was enforceable because
21  Commission approval was a fait accompli or a mere formality on a
22  public agency's consent calendar.  The express condition
23  precedent to an enforceable contract was CTC approval.  Flying J
24  had no legitimate or lawful expectation that the CTC was a rubber
25  stamp for CALTRANS and would not exercise independent legislative
26  judgment in the approval process.  Flying J never had a right or

59

reasonable expectation to perfunctory approval by CTC consent. No public agency can contract or pre-commit to the performance of a quasi-legislative act, approval of the purchase agreement.  The entire foundation of Flying J's lawsuit is fatally flawed.  The State Courts finally decided Flying J had and has had its day in court on the enforceability of the contract and the propriety of the proceedings by which its agreement was disapproved.[3]

Defendants' motions to dismiss the SAC on the ground that this action is moot are GRANTED.

D.   <u>COLLATERAL ESTOPPEL</u>.

In moving to strike the SAC under the AntiSLAPP provisions and to dismiss the SAC for failure to state a claim upon which relief can be granted, Defendants argue that collateral estoppel effect should be given to the rulings made by the Kern County Superior Court and the now final judgment of the state Court of Appeals.

The parties dispute whether collateral estoppel effect can be given under California law to the findings and conclusions of the Kern County Superior Court.  Flying J argues that they cannot

_____

[3]Flying J's argument, made for the first time at the hearing on November 5, 2007, that the statute of limitations set forth in California Code of Civil Procedure § 340 barred authority of the trial court and the Court of Appeals to consider the validity of the CTC's February 27, 2003 ruling, does not alter this conclusion. Flying J's briefs in support of the petition for writ of mandate specifically refer to the "decisions" of the CTC, no argument was made during the petition for writ of mandate proceedings that the trial court lacked jurisdiction because of the statute of limitations, and, for the reasons set forth above, lack of causation has been conclusively determined.

1  unless the trial court's findings were specifically adopted by

2  the Court of Appeal and asserts that no collateral estoppel

3  effect can be given to the issues whether Lawson had a conflict

4  of interest and whether the Right of Way Contract is authorized

5  under Section 118.  Flying J contends that the Court of Appeal

6  did not rule against Flying J on these issues:

7           *The Court of Appeal affirmed the Superior*
            *Court's judgment on only two of the grounds*
8           *relied upon by the Superior Court* - that
            Lawson's conflict of interest did not matter
9           because of the CTC's February 2004
            reconsideration and that the CTC was within
10          its discretion to disapprove the conveyance
            in February 2004.  Although the Superior
11          Court in the Mandamus Action determined that
            Flying J did not meet its burden of
12          establishing Lawson's disqualifying conflict
            of interest in October 2002, November 2002,
13          or February 2003, the Court of Appeal
            expressly refused to consider this issue,
14          stating in pertinent part:

15               Again, we reiterated that in
                 February 2004 the Commission
16               without Lawson as a member, voted
                 not to approve the proposed
17               conveyance.  Thus, even if we
                 assume (*without deciding*) that
18               Commissioner Lawson had a conflict
                 of interest, Flying J has failed to
19               show how the superior court erred
                 in concluding that Flying J was
20               entitled to no relief.

21

22 Flying J argues that the Superior Court's determination that the

   Right of Way Contract in the settlement agreement was
23
   unauthorized under Section 118 and has no preclusive effect.  *See*
24
   *discussion infra*.  What the Court of Appeals decided was that
25
   Flying J's case is ill-conceived and cannot succeed because
26

                                61

nothing it alleges any defendant did was or could have been the legal cause of harm to Flying J.

In determining the preclusive effect of a state-court judgment, the federal court must "refer to the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); 28 U.S.C. § 1738 (state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken"). As explained in *Lucido v. Superior Court*, 51 Cal.3d 335, 341 (1990):

> Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings ... Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in the former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding ... The party asserting collateral estoppel bears the burden of establishing these requirements.

In *DiRuzza v. County of Tehama*, 323 F.3d 1147 (9th Cir.2003), the Ninth Circuit addressed whether "the collateral estoppel effect of the issues decided by a trial court survive after a reviewing court's affirmance on different grounds?" *Id.* at 1153. The Ninth Circuit held in pertinent part:

California case law addressing this question is sparse.  The earliest of the relevant cases, a California Supreme Court case decided in 1865, supports the conclusion that an appellate court's affirmance for any reason implicitly ratifies all reasoning given in the court below.  To be sure, a nebulous exception to the rule and a recent California appellate decision cut against timeworn precedent and may counsel in favor of more selective application of collateral estoppel principles.  In the end, however, we conclude that the 1865 decision is controlling.  The principles enunciated in that opinion have been questioned by a lower appellate court, but we find no opinions from the highest California court undermining the authority of its early holding.

The venerable nineteenth-century case to which we refer is *People v. Skidmore,* 27 Cal. 287 (Cal.1865).  In the initial stages of *Skidmore's* procedural history, the parties stipulated that a referee would 'try all the issues of law and fact ... and ... report a judgment thereon." *Id.* at 289.  In the resulting report, the referee found 'from the facts ... stated [in the pleadings]' that the plaintiff should not be permitted to recover. *Id.* at 292.  Judgment was entered accordingly, and the plaintiff took the case to the California Supreme Court.  That court affirmed the judgment, but relied upon a procedural issue - misjoinder - in reaching its decision.  The case eventually returned to the California Supreme Court for a determination whether the plaintiff having corrected the misjoinder, could bring suit again.  The court determined that, regardless of its previous opinion's reliance on the misjoinder issue, the referee's report and resulting judgment, which reached the merits of the case, had been affirmed by the judgment accompanying the previous opinion. Accordingly, the plaintiff could not bring suit again, as the merits of the case had already been adjudicated - this despite dicta in the California Supreme Court's first opinion that assured '[t]he effect of the judgment will not be to preclude the plaintiff from suing again when the cause of

63

action can be more formally set out.'  *Id*. at
292.  The pertinent portion of the later and
controlling California Supreme Court opinion
reads:

> The judgment below was not
> reversed, either in whole or in
> part, by the Supreme Court, nor was
> it modified in any particular; and
> it follows, if the Court dealt with
> that judgment at all, it must have
> affirmed it to the whole extent of
> its terms.  But the nature and
> scope of the Court's final action
> is clearly indicated by the words
> 'judgment affirmed,' as they occur
> in the published report of the
> case.  (17 Cal. 261)  We have
> examined the record, now remaining
> in this Court, and find an
> unqualified entry to the effect
> that the judgment was affirmed.
>
> The Court, in examining the
> judgment in connection with the
> errors assigned, found that there
> was at least one ground upon which
> the judgment could be justified,
> and therefore very properly
> refrained from considering it in
> connection with the other errors.
> But the affirmance, still, was an
> affirmance to the whole extent of
> the legal effect of the judgment at
> the time when it was entered in the
> court below.  The Supreme Court
> found no error in the record, and
> therefore not only allowed it to
> stand, but affirmed it as an
> entirety, and by direct expression.

*Id*. at 292-93.

Decades later - in 1940 - the California
Court of Appeals for the First District
arrived at the same conclusion as the
*Skidmore* court, but did not cite that 1865
decision.  In *Bank of America National Trust
& Savings Ass'n v. McLaughlin Land &
Livestock Co.*, 40 Cal.App.2d 620 ... (1940),
the state court evaluated the collateral

estoppel effect of an affirmance by this
court of a judgment of a bankruptcy court.
The bankruptcy court had based its decision
on two grounds, only one of which was invoked
by this court when we affirmed.  The state
court wrote: '[I]t must be assumed that when
the Circuit Court of Appeals affirmed the
judgment it became res judicata of both the
issues tendered and tried.'  105 P.2d at 612.
In support of its ruling, the *McLaughlin*
court relied upon the following passage from
34 *Corpus Juris* 773: 'A general affirmance of
a judgment on appeal makes it res judicata as
to all the issues, claims, or controversies
involved in the action and passed upon by the
court below, although the appellate court
does not consider or decide upon all of
them.'

In 1952 the California Court of Appeals for
the First District, in *Natural Soda Products
Co. v. City of Los Angeles*, 109 Cal.App.3d
440 ... (1952), cited both the *Skidmore* and
*McLaughlin* decisions for the 'general rule'
for which they stand, but noted that some
cases might fall outside the reach of the
principle: 'the rule is not without
exceptions, and where a finding is
unnecessary and immaterial the rule of
collateral estoppel does not operate.'  One
might infer, based on *Natural Soda*'s caveat,
that, when an appellate court affirms without
relying upon any aspect of the trial court's
rationale, the affirmed court's holding will
not necessarily be a bar to future litigation
of any - or at least some - of the issues.
However, in the *Skidmore* case itself, the
California Supreme Court, in its first
opinion, in reviewing the trial-court [sic]
judgment entered pursuant to the referee's
report, did not discuss the merits of the
controversy - *i.e.,* the issues canvassed by
the referee.  Rather, the court cited
misjoinder as the basis for the affirmance.
Thus the *Skidmore* referee's entire
discussion, under an expansive reading of
*Natural Soda*, could be viewed as 'unnecessary
and immaterial,' and hence not being entitled
to any preclusive effect.  Thus, the *Natural
Soda* exception, if writ large, has the
potential to eviscerate the

65

Skidmore/McLaughlin rule.

After *Natural Soda*, all was generally quiet on the collateral estoppel front in the courts of California for almost fifty years. But three years ago the Court of Appeals for the Second District called the state's doctrine into question.   In *Butcher v. Truck Insurance Exchange*, although determining the effect of a prior *federal* diversity judgment, the court made clear that it was 'consider[ing] the rule that applies in California.'   77 Cal.App. 4th 1442 ... (2000).   *Butcher* acknowledged two competing lines of case authority: (1) decisions representing what appeared to be the prevailing California rule discussed above; and (2) decisions exemplified by the Second Circuit's opinion in *Moran Towing & Transportation Co. v. Navigazione Libera Triestina, S.A.,* 92 F.3d 37 (2nd Cir.1937), which held that 'the appellate court in the prior action determines the preclusive effect of its judgment, i.e., the judgment is conclusive on [the ground upheld by the appellate court],' *Butcher*, 92 Cal.Rptr.2d at 531.

*Butcher* did not cite the *Skidmore* holding at all, and noted that the portion of *Corpus Juris* relied upon by *McLaughlin* had lost any claim to authority, having been completely abandoned in *Corpus Juris Secundum*.   *Id*. at 533.   Further, the *Butcher* court observed, the *McLaughlin* court had failed to consider the persuasive arguments marshaled by Judge Augustus Hand in *Moran Towing*.   *Id*. at 534. Ultimately, the *Butcher* court opined that 'the reasoning of the *McLaughlin* court has not withstood the test of time, and it would be unwise to follow a rule that looks only to the judgments, without taking into account of the reasons for those judgments as stated in the appellate courts' opinions .... We hold that if a court of first instance makes its judgment on alternative grounds and the reviewing court affirms on only one of those grounds, declining to consider the other, the second ground is no longer conclusively established.'   *Id*.

*Butcher* appears to be the only published California appellate opinion clearly supporting a departure from the general California rule that an affirmance of a judgment blesses all the grounds voiced in the trial court.  *Butcher* advances plausible arguments against the general California rule, but it comes from an intermediate appellate court which failed to acknowledge that the California Supreme Court, in *Skidmore*, had addressed the subject.  Until we receive a definitive indication that *Skidmore* no longer represents the law of California, we will adhere to that case's precepts.  Therefore, we reiterate the understanding of California law we stated in *Markoff v. New York Life Insurance Co.*, 530 F.2d 841, 842 (9th Cir.1976) ...: '[The California position] is that even if the appellate court refrains from considering one of the grounds upon which the decision below rests, an affirmance of the decision below extends legal effects to the whole of the lower court's determination, with attendant collateral estoppel effect.'

...

Because *Skidmore* remains the law of California, it controls here and, therefore, collateral estoppel bars DiRuzza's suit.  In the instant case and in *Skidmore*, the appellate court in prior litigation affirmed on a ground other than that relied upon by the trial court's judgment.  *Skidmore* makes clear that, in that situation, the trial court's judgment, once affirmed, may be invoked as a bar to relitigation of the issue or issues deemed conclusive in the trial court.  In the state litigation that proceeded parallel to the instant federal litigation, the state trial court found that DiRuzza's resignation was voluntary and that the voluntariness in turn vitiated any claim that the alleged acts of the defendants caused her 'discharge.'  That finding, we hold today, is one the defendants may rely upon to bar relitigation of the issue in federal court.  Absent the causal link found lacking by the state court, DiRuzza's federal claims of retaliatory discharge cannot stand.

67

> Because we conclude that collateral estoppel
> - *i.e.,* issue preclusion - disposes of the
> plaintiff's claims, we find it unnecessary to
> address the district court's alternative
> holding that res judicata - *i.e.,* claim
> preclusion - bars DiRuzza's suit.

323 F.3d at 1153-1157.

In 2006, the California Court of Appeals for the Fourth
District decided *Newport Beach Country Club, Inc. v. Founding
Members of Newport Beach Country Club*, 140 Cal.App.4th 1120
(2006).  The procedural background of *Newport Beach* may be
important to resolving the collateral estoppel issue, it is set
forth below.

The trial court granted summary judgment in favor of The
Newport Beach Country Club, Inc. (NBCC), on two grounds.  In
*Founding Members of the Newport Beach Country Club v. Newport
Beach Country Club, Inc.*, 109 Cal.App.4th 944 (2003) (*Founding
Members I)*, the Fourth District affirmed based on the first
ground and expressly declined to address the second ground
dealing with the registration/notice issue:

> We conclude the trial court correctly
> construed the contract as extending the Right
> of First Offer only to a 'Member Organization
> ... in existence.'  Because the undisputed
> facts revealed that neither the Founding
> Members nor any member organization, as
> referred to in the governing regulations,
> existed as of the date of the agreement to
> sell IBC's stock, NBCC had no obligations
> under the Right of First Offer.  In light of
> this conclusion, we do not address whether
> the agreement to sell IBC's stock constituted
> an agreement to sell 'part or all of' NBCC's
> 'legal interest in the Club.' ....
>
> ...

68

1

> **We need not decide the issue.  The 1987
> Governing Regulations requires NBCC to extend
> the Right of First Offer only to a 'Member
> Organization ... in existence.'  As of
> October 26, 1999, the date of the PacPro
> agreement, neither Founding Members nor any
> member organization, as contemplated by the
> governing regulations, existed.  Accordingly,
> NBCC did not breach the governing regulations
> by not extending the Right of First Offer to
> Founding Members, regardless whether or not
> any Class A Founding Member was required to,
> or did, notify NBCC of the member's election
> to become a shareholder or member of a member
> organization.**

> **...**

> **The judgment is affirmed.  NBCC shall recover
> its costs on appeal.**

*Founding Members I*, 109 Cal.App.4th at 948, 963-965.  After

*Founding Members I* was decided, Founding Members registered with

NBCC as an organization entitled to exercise the Right of First

Offer.  NBCC recognized that right, subject to the limitation

that Founding Members had no right to exercise the Right of First

Offer with respect to the sale of the stock of IBC.  When

Founding Members refused to acknowledge that limitation, NBCC

filed a suit for declaratory relief, seeking *inter alia*, a

declaration that "The Order and Judgment in [*Founding Members I*]

are binding in their entirety on Defendants and establish,

through collateral estoppel/*res judicata*, that the Right of First

Offer is not triggered and does not apply to a proposed sale of

all or a majority of the stock of IBC."  The trial court granted

declaratory relief for NBC on this ground.  In *Newport Beach

Country Club, Inc. v. Founding Members of Newport Beach Country*

*Club, supra,* 140 Cal.App.4th 1120 (*Founding Members II),* the

Fourth District Court of Appeals discussed the cases cited in

*DiRuzza* as well as *DiRuzza,* and also cited Section 27 of the

Restatement Second of Judgments, Comment *o,* which states in

pertinent part:

> 'If the judgment of the court of first
> instance was based on a determination of two
> issues, either of which standing
> independently would be sufficient to support
> the result, and the appellate court upholds
> both of these determinations as sufficient,
> and accordingly affirms the judgment, the
> judgment is conclusive as to both
> determinations ....'

> 'If the appellate court upholds one of these
> determinations as sufficient but not the
> other, and accordingly affirms the judgment,
> the judgment is conclusive as to the first
> determination.'

> 'If the appellate court upholds one of these
> determinations as sufficient and refuses to
> consider whether or not the other is
> sufficient and accordingly affirms the
> judgment, the judgment is conclusive as to
> the first determination.'

140 Cal.App.4th at 1128-1129.   The Fourth District then ruled:

> That criticism [in *Butcher*] of the
> traditional rule is particularly forceful in
> this case.   Unlike the California appellate
> courts in *Butcher* and *McLaughlin*, and the
> Ninth Circuit in *DiRuzza v. County of Tehama*,
> we wrote the appellate decision in *Founding
> Members I*.   We know we did not decide whether
> the Right of First Offer was triggered by a
> proposed sale of IBC's stock and expressly
> stated, 'we do not address whether the
> agreement to sell IBC's stock constituted an
> agreement to sell "part or all" of NBCC's
> "legal interest in the Club." ... To hold now
> the judgment in *Founding Members I* is res
> judicata on that issue would be, as Judge
> Hand put it, 'the height of unreason.'

70

...

We would agree with *Butcher* without equivocation, but for one weakness in that decision: *Butcher* did not cite or discuss *Skidmore*.  *Skidmore* is very old - 75 years older than *McLaughlin* - and like *McLaughlin* its reasoning has not stood the test of time. The Restatement Second of Judgments, Corpus Juris Secundum, Judge Augustus Hand's insight, the *Butcher* decision, logic, and reality are all contrary to *Skidmore*.  But *Skidmore* is, unlike *McLaughlin*, California Supreme Court authority which, age and reason notwithstanding, NBCC argues we are obliged to follow ....

We do not believe we are bound by *Skidmore* for the following reasons.  The California Supreme Court, in questioning the authority of likewise binding United States Supreme Court cases, has recognized 'the authority of an older case may be as effectively dissipated by a later trend of decision as by a statement expressly overruling it.  (*Sei Fujii v. State of California* (1952) 38 Cal.2d 718 ...).  In *Adams v. Southern Pac. Transportation Co.* (1975) 50 Cal.App.3d 37,41 ..., the Court of Appeal declined to follow *Fifield Manor v. Finston* (1960) 54 Cal.2d 632 ..., concluding that the rule expressed in *Fifield* 'is inconsistent with two later developments of California tort doctrine.' The Court of Appeal justified this departure from stare decisis by stating: 'Principled obedience to the *Fifield* rule need not prevent awareness that it may be ripe for renunciation or limitation.  In following a rule decisional of law, an intermediate court of appeal may appropriately analyze the factors which would cast doubt upon its validity.'  (*Adams v. Southern Pac. Transportation Co., supra*, 50 Cal.App.3d at p. 41.)

Later developments in California law certainly draw the validity of *Skidmore* into question and dissipate whatever strength that case once had.  Since *Skidmore* was decided in 1865, the law of res judicata has undergone tremendous change culminating in the

71

Restatement Second of Judgments.  The California Supreme Court has expressed approval of the Restatement Second of Judgments and has cited approvingly to section 27 and the comments to it.  In *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1290, footnote 8 ..., the court, quoting an administrative law treatise, stated: '"Perhaps because it rests so much on logic, res judicata is especially appropriate for a Restatement, and the American Law Institute's Restatement of Judgments (1942) has been an unusually powerful force, but it is now succeeded by a second and improved Restatement of Judgments (1982) which focuses mainly on the two subjects of 'claim preclusion' and 'issue preclusion'"' (See also *County of Santa Clara v. Deputy Sheriffs' Assn.* (1992) 3 Cal.4th 873, 879, fn. 7 ... [citing Rest.2nd Judgments, § 27, com. h]; *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342, fn. 3 ... [citing § 27]; *People v. Sims* (1982) 32 Cal.3d 468, 484 ... [citing § 27, com. d].)

The Supreme Court's acceptance of the Restatement Second of Judgments undercuts *Skidmore*, if not impliedly overruling it. The Supreme Court has never confirmed *Skidmore*.  In *Martin v. Martin* (1970) 2 Cal.3d 752, 763 ..., the court found it unnecessary to address the issue whether a judgment is conclusive only on the ground affirmed by an appellate court decision. (See *Pitts v. City of Sacramento* (2006) 138 Cal.App.4th 853, 858, fn. 7 ... [declining to resolve whether 'scholarly opinion' in *Butcher* was correct].)

The traditional rule is inconsistent with an appellate court's duty under the California Constitution, article VI, section 14 to set forth its decisions in writing 'with reasons stated.'  Giving preclusive effect to both of two alternative grounds for a judgment, when the Court of Appeal expressly declines to address one ground, undermines the credibility and accuracy of the decision.  To comply with the constitutional mandate, and to avoid unintended collateral estoppel

72

consequences under the traditional rule, the appellate court would have to address every ground recited in a judgment, even though a decision on one ground would resolve the dispute before the court.  The traditional rule thus results in judicial inefficiency.

We find no justification for being bound by *Skidmore*.  As Justice Holmes argued in a similar context: 'It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV.  It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.' ....

We believe the California Supreme Court, if faced with the issue today, would adopt the modern rule expressed in comment *o* to the Restatement Second of Judgments, section 27.  We therefore adopt the modern/Restatement Second rule and, agreeing with *Butcher*, hold that 'if a court of first instance makes its judgment on alternative grounds and the reviewing court affirms on only one of those grounds, declining to consider the other, the second ground is no longer conclusively established.' (*Butcher*, *supra*, 77 Cal.App.4th at p. 1460.)

140 Cal.App.4th at 1130-1132.

A later case has bearing on the issue of issue preclusion, *Zeynik v. Superior Court*, 159 Cal.App.4th 76 (2008).  In *Zeynik*, a law firm that had been sued by its former clients for legal malpractice moved to determine the collateral estoppel effect of the Court of Appeal's opinion in an insurance coverage action affirming the trial court's denial of the clients' motion to disqualify the law firm.  The former clients were coplaintiffs with two other companies in the insurance coverage action.  The Court of Appeal affirmed the denial of the motion to disqualify

counsel in the insurance coverage action based on laches and did not reach the merits. The law firm argued that the facts determined by the trial court in the insurance coverage action with respect to the merits of the disqualification motion were conclusively established for purposes of the malpractice action. The trial court denied the law firm's collateral estoppel motion and the Court of Appeal denied the law firm's petition for writ of mandamus, holding:

> We conclude that the governing rule of law is that if a trial court relies on alternative grounds to support its decision and an appellate court affirms the decision based on fewer than all of those grounds, only the grounds relied on by the appellate court can establish collateral estoppel. In so holding, we agree with the rule of law stated in *Newport Beach County Club, Inc. v. Founding Members of Newport Beach Country Club* (2006) 140 Cal.App.4th 1120 ... and *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442 ... We conclude that *People v. Skidmore* (1865) 27 Cal. 287, which has been cited in support of a contrary rule, is not on point and should not be extended to apply in these circumstances.

159 Cal.App.4th at 79. The *Zeynik* Court explained:

> The opportunity for review of a decision is an important procedural protection against a potentially erroneous determination and is a factor to consider in determining whether collateral estoppel applies ... Appellate review provides a degree of assurance that the issue was correctly decided and enhances the reliability of the determination. When an appellate court declines to review a particular ground for a trial court decision, the reliability of that ground is not enhanced and is left in the same condition as if there had been no opportunity for review. The principal reason for an appellate court to decline to review alternative grounds for

74

1        a trial court decision is judicial economy,
which is a justification that we would not

2        impugn.  With regard to ensuring the
reliability of a determination, however, an

3        appellate court's failure to review an
alternative ground on appeal has the same

4        effect as the absence of an opportunity for
review and, we believe, should result in no

5        collateral estoppel as to that alternative
ground.

6

7        Moreover, to accord collateral estoppel
effect to alternative grounds relied on by

8        the trial court after the appellate court
affirmed on another ground and declined to

9        review the alternative grounds as a matter of
course, in order to avoid the unintended

10       consequence of establishing collateral
estoppel on grounds that the appellate court

11       did not review.  This would dramatically
increase the burden on appellate courts.  Any

12       benefit that might result from precluding the
relitigation of issues in potential

13       collateral litigation, which may or may not
arise, would come at the cost of increasing

14       the burden on the appellate court in the
initial action.  If an appellate court is

15       aware of or anticipates collateral litigation
and believes that to establish collateral

16       estoppel on an alternative ground would be
beneficial, the court may affirm the trial

17       court judgment on more than one ground.  (See
Rest.2d Judgments, § 27, com. o, p.263.)  The

18       respondent on appeal may urge the court to do
so.  In our view, a blanket rule according

19       collateral estoppel effect to each
alternative and unreviewed ground for a trial

20       court decision in these circumstances for the
purpose of precluding relitigation of issues

21       in collateral litigation is unnecessary and
would be unwise.

22  **159 Cal.App.4th at 85.**

23     A district court is bound by Ninth Circuit precedent.  ***See***

24  ***Zuniga v. United Can Co.***, 812 F.2d 443, 450 (9th Cir.1987);

25  ***Olympic Sports Products, Inc. v. Universal Athletic Sales Co.***,

26  760 F.2d 910, 912-913 (9th Cir.1985), ***cert. denied sub nom.***

*Whitaker Corporation v. Olympic Sports Products, Inc.*, 474 U.S. 1060 (1986).  In *Torrance National Bank v. The Aetna Casualty & Surety Company*, 251 F.2d 666, 669 n.5 (9th Cir.1958), the Ninth Circuit noted:

> This Court does not overlook that in some situations a federal court, in a diversity suit, may refuse to follow a state supreme court decision.  It is not necessary that a case be expressly overruled in order to lose its persuasive force.  *Cf. Mason v. American Emery Wheelworks,* 1 Cir., 1957, 241 F.2d 906. the law is in part an evolutionary process of judicial reasoning.  If convinced that the California Supreme Court would no longer follow the *Bendit* case, then, under the *Erie Railroad Co. v. Tompkins* decision ..., this Court should apply the same standards which it believes the highest court of this State would use.

Because the California Supreme Court's decision in *Skidmore* and the Ninth Circuit's decision in *DiRuzza* are binding law of the state and Ninth Circuit, respectively,  and a federal trial court does not have the authority to change the state law of California even if a Supreme Court decision is criticized and not followed by more recent intermediate California appellate decisions, *see Butcher, Newport Beach*, and *Zeynik*, the rule of *Skidmore* applies.

Defendants argue that *Newport Beach's* reliance on Restatement 2nd's Comment *o* is flawed because that court failed to recognize that the Restatement Second of Judgments has not been incorporated into California law in its entirety and that comment *i* to Section 27 is not followed in California and has been harshly criticized in other jurisdictions.

Comment *i* to Section 27 states:

76

**i.  Alterative determinations by court of first instance.**

**If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone.  See Illustration 14.  Cf. § 20, comment e.**

The California case Defendants represent does not follow the Section 27, comment *i* standard, *Wall v. Donovan*, 113 Cal.App.3d 122 (1980), does not so hold.  *Wall* expressed the rule set forth in the 1942 version of the Restatement of Judgments, section 68, comment n: "Where the judgment is based upon the matters litigated as alternative grounds, the judgment is determinative on both grounds, although either alone would have been sufficient to support the judgment."  *Wall* was decided before the Restatement Second of Torts was issued in 1982, it does not support Defendants' position.  Independent research reveals no reported California decision discussing or applying comment *i* to Section 27.

Defendants cite *Griset v. Fair Political Practices Commission,* 25 Cal.4th 668 (2001).  In *Griset,* a political candidate brought an action for writ of mandamus against the Fair Political Practices Commission, challenging the constitutionality of Government Code § 84305.  The trial court granted summary judgment holding the statute was constitutional.  The state Court of Appeal and state Supreme Court affirmed that ruling.  Thereafter, the plaintiff renewed the motion for summary judgment

77

in the trial court, relying on a United States Supreme Court
decision issued after the California Supreme Court had issued its
decision.  The trial court entered summary judgment for the
defendant.  The Court of Appeal affirmed in part and reversed in
part, and remanded with directions, finding that plaintiff's
litigation could be revived and that Government Code § 84305 was
unconstitutional based on the intervening United States Supreme
Court decision.  The California Supreme Court reversed the Court
of Appeal's judgment with directions to reverse as void the trial
court's second judgment.  In pertinent part, the Supreme Court
held:

> A reviewing court has authority to 'affirm,
> reverse, or modify any judgment or order
> appealed from, and may direct the proper
> judgment or order to be entered, or direct a
> new trial or further proceedings to be had.'
> (Code Civ. Proc., § 43.)  The order to the
> reviewing court is contained in its
> remittitur, which defines the scope of the
> jurisdiction of the court to which the matter
> is returned.  'The order of the appellate
> court as stated in the remittitur, "is
> decisive of the character of the judgment to
> which the appellant is entitled.  The lower
> court cannot reopen the case on the facts,
> allow the filing of amended or supplemental
> pleadings, nor retry the case, and if it
> should do so, the judgment rendered thereon
> would be void."' ....
>
> In *Griset I*, ..., we affirmed without
> directions the judgment of the Court of
> Appeal, which in turn had rendered an
> unqualified affirmance of the superior
> court's judgment.  An unqualified affirmance
> 'ordinarily sustains the judgment and ends
> the litigation.' ... Once our decision in
> *Griset I* became final, the superior court did
> not have jurisdiction to reopen or retry the
> case, which the court purported to do when it

allowed plaintiffs in 1995 to 'renew[]' their
1991 motions for summary adjudication and
summary judgment.  Therefore, the superior
court's later judgment was void insofar as it
encompassed or rested upon a redetermination
of the merits of the litigation.

25 Cal.4th at 701.

Relying on *Griset*, Defendants argue that neither *Butcher* nor

*Newport Beach* "recognize the fact that, under California law, a

general affirmance, like the affirmance here, operates to sustain

the judgment of the superior court and end the litigation" as if

the judgment is final, notwithstanding later changes in the law.

Defendants contend:

This concept was of primary importance in
*Skidmore,* which explained the judgment in the
original action 'was not reversed, either in
whole or in part, by the Supreme Court, nor
was it modified in any particular,' and that
'it affirmed to the whole extent of its
terms.'  *Skidmore*, 27 Cal. at 292.  The Court
also explained that in the original
proceeding it:

found that there was at least one
ground upon which the judgment
could be justified, and therefore
very properly refrained from
considering it in connection with
the other errors.  But the
affirmance, still, was an
*affirmance to the whole extent of
the legal effect of the judgment at
the time when it was entered in the
court below*.  The Supreme Court
found no error in the record, and
therefore not only allowed it to
stand, but affirmed it as an
entirety, and by direct expression.

*Id.* at 292-93 (emph. added).  Thus, because
a 'general' or 'unqualified' affirmance under
California law operates to sustain the legal
effect of the judgment at the time it was

79

1
2
3
4

                 entered below, it analytically follows that
all grounds fully litigated and decided by
the superior court, and left undisturbed by
the appellate courts, should receive the
effect of a final judgment for collateral
estoppel purposes.

5

    *Griset* is not dispositive as that factual background is

6

simply too different from this case where there has been no

7

change in the law.

8

    Defendants argue that *Founding Members II* is distinguishable

9

because of the opinion's reference to the fact that the Fourth

10

District Court of Appeals wrote *Founding Members I*.  Defendants

11

cite *Moran Towing & Transportation Co. v. Navigazione Libera*

12

*Triestina, S.A., supra*, 92 F.3d at 40: "To treat as controlling

13

the findings of a trial court when the appellate court upsets or

14

disregards them and renders a decision of affirmance on different

15

grounds furnishes parties to other litigations affected by the

16

decision with a false guide."  Defendants argue that the

17

"reasoning of [*Founding Members II*] is simply inapplicable here"

18

because "[i]n contrast to [*Founding Members II*], no findings of

19

the trial court were 'upset' or 'disregarded' by the Fifth

20

District; rather, all of the findings remained intact and were

21

unqualifiedly affirmed on appeal."  This assertion fails to

22

address the appellate court's election not to dispositively

23

address all issues by its statement declining to do so.

24

    Defendants cite *People v. Taylor*, 12 Cal.3d 686, 695 (1974):

25
26

                 We deem the purposes of an application of the
doctrine [of collateral estoppel] to be: (1)
to promote judicial economy by minimizing
repetitive litigation; (2) to prevent

1

                        inconsistent judgments which undermine the
integrity of the judicial system; and (3) to

2

                        provide repose by preventing a person from
being harassed by vexatious litigation ... In

3

                        deciding whether the doctrine is applicable
in a particular situation a court must

4

                        balance the need to limit litigation against
the right of a fair adversary proceeding in

5

                        which a party may fully present his case.

6  Defendants contend that Flying J, through its opposition to

7  [Defendants' AntiSLAPP motions], "is attempting to secure a

8  ruling from this Court that would *entirely contradict* the

9  findings of the Kern County Superior Court, a decision that has

10  now become final and remains in full effect, irrespective of the

11  Fifth District's decision not to specifically address those

12  findings."  Defendants assert that Flying J has cut and pasted,

13  mostly verbatim, its entire argument on this issue from the

14  merits briefing in the Kern County Superior Court case and

15  contend that this Court "should not entertain Flying J's attempt

16  to secure a squarely inconsistent judgment from this Court."

17       Flying J argues that, even if *Skidmore* is controlling, the

18  Superior Court's determinations that Lawson did not have a

19  disqualifying conflict of interest and that the proposed

20  conveyance was not authorized under Section 118 are not

21  conclusive against Flying J because "the factual and procedural

22  posture of *Skidmore* is distinguishable from this case" and

23  because "the Superior Court's determinations regarding Lawson's

24  conflict of interest and the propriety of the proposed conveyance

25  were not necessary to the judgment."

26       In contending that the Fifth District rejected the Superior

81

Court's decision that the proposed conveyance was not authorized by either Section 118 or Resolution G-98-22, Flying J relies on the following sentences from the Fifth District's opinion: "There was nothing to prevent the Commission from approving the proposed conveyance of 20.5 acres to Flying J at the February 2004 Commission meeting if the Commission had chosen to exercise its discretion to do so" and "The Commission's refusal to approve the proposed conveyance was not 'arbitrary' or 'capricious' or 'entirely lacking in evidentiary support.'"

Defendants respond that Flying J is focusing on one sentence out of context.  When the Fifth District opinion is examined in its entirety, Defendants contend:

> ([W]hile arguably worded awkwardly) the quotation reflects the obvious notion that the CTC could have approved the proposed conveyance to Flying J had it determined that the proposed conveyance constituted an 'exchange' under the law.  Since the CTC found the proposed conveyance was not an exchange, the proposed conveyance was unauthorized under section 118 and Resolution G-98-22.  Both the Superior Court and the Fifth District reached the same conclusion in this regard.

Defendants argue that the Fifth District did not "reject" the Superior Court's conclusion

> but instead ruled that the CTC appropriately found 'the proposed conveyance would not be an 'exchange' within the meaning of the Paragraph 2.3 words "excess property ... exchanged for other land required for transportation purposes."' ... The court of appeal further explained that, '*even if we could conclude that the proposed conveyance were authorized* by Paragraph 2.3 of Resolution G-98-22,' a finding the court of

1
2
3
4
5
6
7

> appeal certainly did not affirmative [sic]
> make, 'the proposed conveyance was still
> subject to Commission approval.' ... This
> portion of the opinion - which, incidentally,
> is the only portion of the opinion that
> discusses the substantive issue of whether
> the proposed conveyance as presented by
> Flying [sic] was authorized - makes plain
> that the Fifth District found that the
> proposed conveyance was *not* authorized as
> presented to the CTC.  Thus, Flying J cannot
> reasonably contend that the Fifth District
> found the conveyance was legally valid.

Defendants' contention accurately states the meaning of the Court of Appeals decision affirming the Superior Court.  Flying J's assertions to the contrary are based on a tortured reading of the Court of Appeals' decision.  Neither state court found the proposed conveyance to Flying J legally enforceable without CTC approval.

Flying J argues that even if preclusive effect is given to the determination that the Right of Way Contract did not comply with Section 118 and Resolution G-98-22, because the object of the Right of Way Contract was lawful, the Right of Way Contract is not "illegal" or "void."  *See City of Orange v. San Diego County Employees Retirement Assn.*, 103 Cal.App.4th 45, 57 (2002).  *Sanders v. Superior Court*, 27 Cal.App.4th 832, 843 (1994), holds that "case law recognizes a tort action for interference with a contract even if the contract is unenforceable", citing *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1127-1128 (1990).  Therefore, Flying J contends, it is entitled to proceed with its claims against Defendants for intentional interference with contract, intentional interference with

83

prospective economic advantage, and unfair competition.

Flying J does not accurately state the law as to the tort of intentional interference with contract.  In *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, the California Supreme Court, discussing an "at-will" employment contract, stated:

> Cases establishing a cause of action for interference with at-will and voidable contracts make it clear that it is the contractual relationship, not any term of the contract, which is protected against outside interference.  We have affirmed that interference with an at-will contract is actionable interference with the contractual relationship, on the theory that a contract '"at the will of the parties, respectively does not make it one at the will of others.' ... As Justice Tobriner said in the context of voidable contracts: 'The actionable wrong lies in the inducement to break the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable.' ... Reviewing courts have reiterated in case after case that the contractual relationship is at the will of the parties, not at the will of outsiders ....
>
> Further, the expectation that the parties will honor the terms of the contract is protected against officious intermeddlers. Since people '"usually honor their promises no matter what flaws a lawyer can find, the offender should not be heard to say that the contract ... meddled with could not have been enforced ....' ....

However, in *PMC, Inc. v. Saban Entertainment, Inc.*, 45 Cal.App.4th 579 (1996), *overruled on other grounds*, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003), the Court of Appeal, relying on *Della Penna v. Toyota Motors Sales, U.S.A., Inc.*, 11 Cal.4th 376 (1995), held that, if there is no

enforceable contract, the plaintiff is limited to a cause of action for interference with prospective economic advantage.  45 Cal.App.4th at 594-602.  *PMC, Inc.* has been followed by *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal.App.4th 867, 877-879 (1997):

> We agree with *PMC's* analysis and conclusion that a cause of action for intentional interference with contractual relations requires an underlying enforceable contract, and where the underlying contract is unenforceable, only a claim for interference with prospective economic advantage lies.  We believe this rule is a proper extension of the California Supreme Court's admonition that courts should not blur the analytical line between the two interference torts and its recognition that the 'formally cemented economic relationship' created by an '*existing* contract' is entitled to greater solicitude than a relationship falling short of that. ....

Here, Flying J had an inchoate, conditional agreement with Caltrans, that by its terms and law, was subject to CTC approval.  The agreement was for the purchase of publically owned real property, subject to laws and regulations governing the sale, disposition, and/or exchange of publically owned real property.  CTC approval was to be obtained in a quasi-legislative proceeding, a CTC hearing in open session to approve the agreement on the calendar without public discussion, consent or after CTC discussion and vote in a public session of the CTC.  Whether an interference with contract or prospective advantage theory is advanced, Defendants had a constitutional First Amendment right to petition their government and provide comment

pro or con on the proposed agreement for purchase, sale, and exchange of public land.  Flying J seeks to make tortious conduct absolutely authorized by and privileged under law; i.e., to challenge before the commission the fairness and value of the consideration to be received for the purchase of excess public property and in relation to a public hearing before a public agency.

Flying J further argues that collateral estoppel will not bar its claims that Defendants engaged in unfair conduct as defined under California's Unfair Competition Law.

Defendants respond that Flying J is barred from relitigating the issue of the legality of the proposed conveyance which was decided by the Superior Court and affirmed by the Fifth District Court of Appeals.  The Court of Appeals specifically affirmed the finding that there was no causal connection between the alleged behavior of Defendants and the CTC's ultimate decision on reconsideration in 2004 to reject the proposed conveyance, as the 2004 decision was unrelated to Lawson or anyone associated with him.

The Court of Appeal did not ignore the issue of Defendant Lawson's alleged conflict of interest in affirming the Superior Court's judgment.  The Court of Appeal assumed for purposes of appeal that Lawson did have a conflict of interest, but ruled that the conflict of interest was irrelevant because of the Superior Court's accurate analysis that the 2004 CTC reconsideration of the proposed transaction, made at Flying J's

86

request, negated any impact or effect of any assumed conflict of interest by reason of Lawson's absence from the CTC and failure of proof that Lawson had any role in the public decision.

These issues that the settlement agreement was not authorized by Section 118 or Resolution G-98-22, of conflict of interest and lack of causation cannot be relitigated *de novo*, a third time.[4]

Defendants' motions to dismiss and/or strike the SAC on the ground of collateral estoppel are GRANTED.

<u>CONCLUSION</u>

For the reasons stated above:

1.   Defendants' motions to dismiss and/or strike the Second Amended Complaint as moot and barred by collateral estoppel are GRANTED;

2.   Defendants' motions to strike and to dismiss the Second Amended Complaint are DENIED AS MOOT;

3.   Counsel for Defendants shall prepare and lodge a form of order setting consistent with this Memorandum Decision within five (5) days following the date of service of this decision.

IT IS SO ORDERED.

Dated: __March 31, 2008__          _____/s/ Oliver W. Wanger_____
                                          UNITED STATES DISTRICT JUDGE

---

[4]**The rulings in this Memorandum Decision make unnecessary resolution of the grounds for relief asserted in Defendants' motions to strike pursuant to California Code of Civil Procedure § 425.16 and to dismiss pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure.**